Peter J. ROGERS and Karen Rogers,
Plaintiffs–Appellees,

v.

CONSOLIDATED RAIL
CORPORATION, Defendant–Appellant.

No. 162, Docket 91–7440.

United States Court of Appeals,
Second Circuit.

Argued Sept. 11, 1991.

Decided Nov. 5, 1991.

Scott A. Barbour (McNamee, Lochner, Titus and Williams, P.C., Albany, N.Y., of counsel), for defendant-appellant.

Ira M. Maurer (Elkind, Flynn & Maurer, P.C., New York City, of counsel), for plaintiffs-appellees.

Before KEARSE, MINER and McLAUGHLIN, Circuit Judges.

McLAUGHLIN, Circuit Judge:

Consolidated Rail Corp. ("Conrail") appeals from an order of the United States District Court for the Northern District of New York, Cholakis, *Judge*, denying its motion for summary judgment dismissing plaintiffs' claims under New York's Workers' Compensation Law ("WCL"). The district court adhered to its prior ruling, which had denied Conrail's motion under Fed. R.Civ.P. 12(b)(1) and (6) to dismiss the same claims.[1] Conrail contends that state-law damage claims for injuries sustained extraterritorially are preempted by the Federal Employers' Liability Act ("FELA"), 45

---

1. *See Rogers v. Consolidated Rail Corp.*, 688 F.Supp. 835 (N.D.N.Y.1988).

U.S.C. § 51 *et seq.* (1982). We disagree and therefore affirm.

## BACKGROUND

Plaintiff Peter Rogers, a New York resident, worked for defendant Conrail as a freight conductor. He worked out of Conrail's Massena, New York facility. On July 25, 1986, Rogers was travelling on a Conrail train from the Massena Yard to Valleyfield, Quebec, Canada when he fell off the train just outside Valleyfield, Quebec. Rogers sustained back injuries and he alleges that the fall was caused by Conrail's failure to maintain safe working conditions and by its negligent supervision of its trainmaster.

On September 23, 1986, the Rogers (husband and wife) filed their complaint in the district court, asserting claims under both FELA and the WCL. Conrail moved to dismiss the complaint for lack of subject matter jurisdiction and for failure to state a claim upon which relief could be granted. Judge Cholakis granted the motion with respect to the FELA claim, holding that the statute did not provide a remedy for injuries sustained abroad. *See* 688 F.Supp. at 836 (citing *Lauritzen v. Larsen,* 345 U.S. 571, 581, 73 S.Ct. 921, 927–28, 97 L.Ed. 1254 (1952)). However, he denied the motion with respect to the Rogers' claims under the WCL, rejecting Conrail's assertion that FELA preempted them. After discovery was taken, Conrail renewed its objections in a summary judgment motion,[2] again arguing that FELA preempted the Rogers' state-law claims.

Judge Cholakis denied Conrail's summary judgment motion. He certified Conrail's interlocutory appeal pursuant to 28 U.S.C. § 1292(b) and we granted Conrail's petition for permission to appeal pursuant to Fed.R.App.P. 5(a). Because we agree that FELA does not have extraterritorial effect and therefore does not preempt state-law remedies for injuries sustained beyond United States borders, we now affirm the district court's order.

## DISCUSSION

■ The dispositive issue on appeal is narrow: does FELA preempt all state-law claims by railway employees for injuries sustained extraterritorially? If so, then a New York resident has no claim under the WCL even when, as here, FELA affords no remedy. If not, then he may sue under the WCL.

■ We start from the proposition that "[p]re-emption of state law by federal statute or regulation is not favored 'in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained.'" *Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.,* 450 U.S. 311, 317, 101 S.Ct. 1124, 1130, 67 L.Ed.2d 258 (1981) (quoting *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963)). This presumption against preemption is particularly apt when, as here, the state law said to be preempted is within the states' traditional police powers. *See Ray v. Atlantic Richfield Co.,* 435 U.S. 151, 157, 98 S.Ct. 988, 994, 55 L.Ed.2d 179 (1978); *Aetna Life Ins. Co. v. Borges,* 869 F.2d 142, 144 (2d Cir.), *cert. denied,* 493 U.S. 811, 110 S.Ct. 57, 107 L.Ed.2d 25 (1989).

Congress may preempt state law in several ways:

First, in enacting the federal law, Congress may explicitly define the extent to which it intends to preempt state law. Second, even in the absence of express pre-emptive language, Congress may indicate an intent to occupy an entire field of regulation, in which case the States must leave all regulatory activity in that area to the Federal Government. Finally, if Congress has not displaced state regulation entirely, it may nonetheless pre-empt state law to the extent that the

---

**2.** Although the parties disagree on whether FELA applies extraterritorially, there is no disagreement that even if FELA does apply, it provides no remedy in this case. Accordingly, Rogers has not sought to appeal the district court's dismissal of his FELA claim for failure to provide a remedy, and that distinct issue is not before us.

state law actually conflicts with federal law.

*Michigan Canners & Freezers Ass'n, Inc. v. Agricultural Mktg. & Bargaining Bd.,* 467 U.S. 461, 469, 104 S.Ct. 2518, 2522–23, 81 L.Ed.2d 399 (1984) (citations omitted).

It is now well-settled that Congress explicitly directed that FELA wholly preempt state-law remedies for railway employees injured in the course of employment when any part of that employment furthers interstate commerce. *See New York Cent. R.R. Co. v. Winfield,* 244 U.S. 147, 151–52, 37 S.Ct. 546, 548, 61 L.Ed. 1045 (1917); *see also* H.R.Rep. No. 1386, 60th Cong., 1st Sess. 3 (1908) (FELA "will supplant the numerous State statutes on the subject so far as they relate to interstate commerce"). Thus, if FELA applies to the Rogers' state-law claims, it preempts them. Our task, therefore, is to ascertain whether FELA governs actions by railway employees injured beyond United States borders. Because it is undisputed that FELA fails to provide a remedy for injuries suffered outside the United States, *see Lauritzen,* 345 U.S. at 581, 73 S.Ct. at 927–28, a holding that the statute nevertheless preempts state-law remedies would obviously leave the Rogers without any redress under United States law. In short, we must determine whether Congress intended that American railway employees injured extraterritorially should be denied relief under our law.[3]

In this case of first impression the FELA statute itself is singularly unenlightening. Supreme Court precedent is also sparse, although it is clear that FELA does not itself provide a remedy for extraterritorial injuries. *See New York Cent. R.R. Co. v. Chisholm,* 268 U.S. 29, 31, 45 S.Ct. 402, 402, 69 L.Ed. 828 (1925); *Boak v. Consolidated Rail Corp.,* 850 F.2d 110, 111 (2d Cir.1988) (per curiam). The cases, however, do not articulate whether this is so because the statute simply does not apply extraterritorially or because Congress meant FELA to apply beyond American borders but not to provide redress for injuries sustained abroad. In choosing between these conflicting rationales, we must decide "which choice is it the more likely that Congress would have made?" *Burnet v. Guggenheim,* 288 U.S. 280, 285, 53 S.Ct. 369, 370–71, 77 L.Ed. 748 (1933) (Cardozo, J.).

When divining congressional intent, we are mindful of Justice Frankfurter's counsel that "[l]egislation has an aim; it seeks to obviate some mischief, to supply an inadequacy, to effect a change of policy, to formulate a plan of government." Frankfurter, *Some Reflections on the Reading of Statutes,* 47 Colum.L.Rev. 527, 538–39 (1947). An examination of FELA's legislative genesis is informative. *See FDIC v. Tremaine,* 133 F.2d 827, 830 (2d Cir.1943) (L. Hand, J.) ("[t]here is no surer guide in the interpretation of a statute than its purpose when that is sufficiently disclosed").

The explosive development of a national railway system in the nineteenth century was one of the cornerstones of this country's economic revolution. *See generally* G. Kalko, Railroads and Regulation: 1877–1916, at 1–5 (1965). The railroad's integral role in industrialization, however, came at great expense; thousands of railway workers were killed or maimed toiling on these machines of modernization. *See Johnson v. Southern Pac. Co.,* 196 U.S. 1, 19–20, 25 S.Ct. 158, 162–63, 49 L.Ed. 363 (1904); Griffith, *The Vindication of a National Public Policy Under [FELA],* 18 Law & Contemp.Probs. 160, 162–66 (1953); *see also* S.Rep. No. 460, 60th Cong., 1st Sess. 3 (1908) ("Everybody understands that our railway workmen do their work in the constant presence of danger, where a single misstep is often fatal."). In 1889, President Harrison bemoaned this situation, telling Congress " '[i]t is a reproach to our civilization that any class of American workmen, should, in the pursuit of a necessary and useful vocation, be subjected to a peril of life and limb as great as that of a soldier in time of war.' " Griffith, *supra,* at 162 (quoting *Johnson,* 196 U.S. at 19, 25 S.Ct. at 162).

---

**3.** Conrail maintains that the Rogers must look exclusively to the law of Quebec for whatever relief may be available. If FELA preempts New York law in this context, Conrail is correct.

That railway workers were so often subject to death and disfigurement was only part of this tragic situation. Those who survived debilitating injuries were often denied redress in our nation's courts because of hoary common law rules, like the fellow-servant doctrine, ill-suited to the plight of railway laborers. *See Winfield*, 244 U.S. at 164, 37 S.Ct. at 553–54 (Brandeis, J., dissenting); S.Rep. No. 661, 76th Cong., 1st Sess. 4 (1939) ("such simple doctrines do not apply equitably under the infinite complexities of modern industrial practices").

Against this historical backdrop, Congress began to regulate railway safety. In 1893, it enacted the Federal Safety Appliance Act, requiring various safety devices on all railroad cars. *See* 27 Stat. 531 (1893) (codified as amended at 45 U.S.C. §§ 1–16); *see also Lilly v. Grand Trunk W. R.R. Co.*, 317 U.S. 481, 486, 63 S.Ct. 347, 351, 87 L.Ed. 411 (1943) (Safety Appliance Act "is to be liberally construed in the light of its prime purpose, the protection of employees and others by requiring the use of safe equipment"). Two years later, a version of FELA was introduced in Congress. The bill ultimately elicited the support of President Roosevelt and became the original Federal Employers' Liability Act of 1906. *See* 34 Stat. 232 (1906); Griffith, *supra*, at 166. The statute's objectives were plain:

> The passage of the law was urged upon the strongest and highest considerations of justice and promotion of the public welfare. It was largely influenced by the strong message of President Roosevelt to the Sixtieth Congress in December, 1907, in which the basis of the legislation was clearly and strongly placed upon the ground of justice to the railroad workmen of this country....

S.Rep. No. 432, 61st Cong., 2d Sess., *reprinted in* 45 Cong. Rec. 4040, 4041 (Mar. 31, 1910). FELA thus modified or eliminated the common-law defenses that had precluded railway employees from recovering from their employers for injuries sustained in the course of their employment.

The original act was struck down in 1908 by a Supreme Court notoriously hostile to economic regulation. *See Howard v. Illi-*

*nois Cent. R.R. Co.*, 207 U.S. 463, 504, 28 S.Ct. 141, 147–48, 52 L.Ed. 297 (1908). Congress responded by passing a constitutional version of the law three months later. *See* 35 Stat. 65 (1908). The Senate Committee on Education and Labor considered reenactment of FELA "a wise step toward the establishment of justice and fair-dealing among men." S.Rep. No. 460, 60th Cong., 1st Sess. 4 (1908). Congress declared that its

> purpose ... in the passage of this act was to extend further protection to employees. This was its manifest purpose, as is apparent from a consideration of the circumstances of its enactment. It is manifest from a consideration of the reports, both of the Senate and House committees, when the measure was pending before those bodies prior to its enactment, that the purpose of the statute was to extend and enlarge the remedy provided by law to employees engaged in interstate commerce in cases of death or injury to such employees while engaged in such service. No purpose or intent on the part of Congress can be found to limit or to take away from such an employee any right theretofore existing by which such employees were entitled to a more extended remedy than that conferred upon them by the act.

S.Rep. No. 432, 61st Cong., 2d Sess., *reprinted in* 45 Cong.Rec. 4040, 4044 (Mar. 31, 1910) (amending FELA).

Proving once again that cumbersome rules of procedure will bedevil even the most enlightened substantive innovations, the new FELA rights were immediately stymied by the ancient federal venue statutes which generally required an injured employee to sue his employer in the state where it was incorporated. *See* Griffith, *supra*, at 167. Congress responded by providing a more liberal venue provision for FELA actions. *See* 36 Stat. 291 (1910). In doing so, Congress strongly reaffirmed its intent that railway workers be compensated for injuries sustained in their employment:

> It was the intention of Congress in the enactment of this law originally and it may be presumed to be the intention of

the present Congress to shift the burden of the loss resulting from these casualties from "those least able to bear it" and place it upon those who can ... "measurably control their causes."
S.Rep. No. 432, 61st Cong., 2d Sess., *reprinted in* 45 Cong.Rec. 4040, 4041 (Mar. 31, 1910) (quoting *St. Louis, I.M. & S. Ry. Co. v. Taylor*, 210 U.S. 281, 296, 28 S.Ct. 616, 621, 52 L.Ed. 1061 (1908)).

In the ensuing years, FELA "ran the rapids of streams of restrictive interpretations and of constructions placed upon its provisions by the courts which reimposed many of the old common-law defenses that, in the original Act, it was the intention of Congress to abolish." Griffith, *supra*, at 168. Once again, Congress remedied the situation, forcefully and dramatically amending the statute to leave no doubt about its broad scope and remedial spirit. *See* 53 Stat. 1404 (1939); *Wilkerson v. McCarthy*, 336 U.S. 53, 68–69, 69 S.Ct. 413, 420–21, 93 L.Ed. 497 (1949) (Douglas, J., concurring); *see also Atchison, Topeka & Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 562, 107 S.Ct. 1410, 1413–14, 94 L.Ed.2d 563 (1987) ("We have recognized generally that the FELA is a broad remedial statute, and have adopted a 'standard of liberal construction in order to accomplish [Congress'] objects.' ") (quoting *Urie v. Thompson*, 337 U.S. 163, 180, 69 S.Ct. 1018, 1029–30, 93 L.Ed. 1282 (1949)); *Kernan v. American Dredging Co.*, 355 U.S. 426, 432, 78 S.Ct. 394, 398, 2 L.Ed.2d 382 (1958) ("it is clear that the general congressional intent [in FELA and the Jones Act] was to provide liberal recovery for injured workers"); *Urie*, 337 U.S. at 181–82, 69 S.Ct. at 1030–31 (construing FELA according to its "remedial and humanitarian purpose, and the constant and established course of liberal construction of the Act followed by this Court"); *Jamison v. Encarnacion*, 281 U.S. 635, 640, 50 S.Ct. 440, 442, 74 L.Ed. 1082 (1930) (FELA "is to be construed lib-

erally to fulfill the purposes for which it was enacted"); *Eggert v. Norfolk & W. Ry. Co.*, 538 F.2d 509, 511 (2d Cir.1976) ("Congress intended the Act to be remedial legislation").

This rich history is enough to convince us of Congress' unyielding insistence that FELA be liberally construed to facilitate recovery. Viewed through this prism, Conrail's contention that FELA applies extraterritorially, only so that it might altogether deprive injured employees of a remedy under American law, is startling. Indeed, Conrail has not cited us to any expression of congressional intent which would support this grim conclusion.[4] We reject it, in the belief that Congress intended FELA to apply only to accidents occurring within the United States.

Our territorial view of FELA's scope accords with the sweeping language, if not the holdings of *Chisholm* and its progeny. *See, e.g., Lauritzen v. Larsen*, 345 U.S. 571, 581, 73 S.Ct. 921, 927–28, 97 L.Ed. 1254 (1953) ("we have held [FELA] not applicable to an American citizen's injury sustained in Canada") (dictum); *Boak*, 850 F.2d at 111 ("FELA does not have extraterritorial effect"); *Cox v. Chesapeake Ohio R.R. Co.*, 494 F.2d 349, 350 (6th Cir.) (FELA "does not apply to railroad employees injured outside the territorial United States"), *cert. denied*, 417 U.S. 977, 94 S.Ct. 3184, 41 L.Ed.2d 1146 (1974); *Cruz v. Chesapeake Shipping Inc.*, 738 F.Supp. 809, 820 (D.Del.1990) ("The FELA has no extraterritorial effect."). In sum, we hold that FELA does not apply extraterritorially and therefore does not preempt state-law remedies for railway employees injured abroad.

We recognize that this conclusion makes Conrail amenable to the Rogers' action under section 11 of the WCL, which is admittedly punitive in nature. That section permits an injured employee to bring a plenary tort suit against his employer when that

---

**4.** Conrail's counsel conceded as much in oral argument:
Judge Miner: "What is there in congressional history or in the statute that shows the intention of Congress to leave an American citizen without a remedy, under American law?"

Conrail's Counsel: "There is nothing expressly within the intent of Congress about that particular issue."

 

employer has failed to secure workers' compensation insurance, as required by the WCL. Railroads have known since 1925, when *Chisholm* was decided, that FELA afforded no remedy to a United States employee injured abroad. Yet, Conrail disregarded the mandate of New York's WCL, apparently on the assumption that United States courts would relegate resident employees injured abroad to seek recovery under foreign law. This reliance clearly entailed the risk that Conrail's construction of FELA might be erroneous. Conrail, not the Rogers, must now suffer the consequences of this mistaken assumption. Railway employers are now on notice that FELA does not absolve them of their state-mandated obligation to compensate employees who are injured abroad.

Conrail's remaining arguments need not detain us. First, Conrail contends that WCL Section 113, which provides that parties otherwise subject to federal law may elect the benefits of the WCL, requires that the Rogers obtain Conrail's consent to be governed by the WCL, and no such consent has been obtained. Having concluded that FELA does not apply extraterritorially, however, Section 113 is clearly inapposite, and no consent is needed.

■ Finally, Conrail maintains that even if FELA does not preempt state law, New York, in this case, would choose to apply the law of Quebec, Canada, where Roger's injury occurred. This contention is meritless. New York courts apply the law of the jurisdiction having the most significant contacts with the action. *See Schultz v. Boy Scouts of Am., Inc.*, 65 N.Y.2d 189, 196, 491 N.Y.S.2d 90, 94, 480 N.E.2d 679, 683 (1985); *see also Nashko v. Standard Water Proofing Co.*, 4 N.Y.2d 199, 201, 173 N.Y.S.2d 565, 567, 149 N.E.2d 859, 861 (1958) (WCL applies if employment located in New York). Although the accident occurred in Canada, Rogers resides in New York, worked out of a Conrail facility in New York, and, except for his initial hospitalization, has been treated for his injuries in New York. Thus, New York has the dominant interest in this controversy and its law should apply.[5] The applicable law would then be the New York WCL. *See, e.g., Lewis v. Knappen Tippetts Abbett Eng'g Co.*, 304 N.Y. 461, 465–66, 108 N.E.2d 609 (1952) (affirming WCL award to widow of employee killed in Israel); *McMains v. Trans World Airlines, Inc.*, 18 A.D.2d 956, 957, 237 N.Y.S.2d 812, 814 (3d Dept.) (upholding WCL award to widow of pilot working out of Hamburg and killed in Brazil), *appeal denied*, 13 N.Y.2d 593, 240 N.Y.S.2d 1025, 190 N.E.2d 905 (1963).

## CONCLUSION

Accordingly, the district court's decision denying Conrail's summary judgment motion is affirmed.

---

5. For a more thorough examination of this issue, see Judge Cholakis' earlier opinion denying Conrail's motion to dismiss the complaint, 688 F.Supp. 835, 839–41 (N.D.N.Y.1988).