No. 02-242

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 289

ROBERT REIDELBACH,

Plaintiff and Appellant,

v.

BURLINGTON NORTHERN AND
SANTA FE RAILWAY COMPANY,
a Delaware corporation and SCOTT
JACOBSEN,

Defendants and Respondents.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and for the County of Cascade,
The Honorable Julie Macek, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Erik B. Thueson and Julianne C. Burkhardt, Thueson & Lamb, Helena,
Montana

For Respondents:

Jon Moyers, Jeff Hedger, Hedger Moyers, Billings, Montana

Submitted on Briefs:  September 5, 2002

Decided:  December 10, 2002

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1  Robert Reidelbach (Reidelbach) appeals the Order of the Montana Eighth Judicial District Court dismissing various counts of his complaint against Burlington Northern and Santa Fe Railway Company (BNSF) based upon the conclusion that the Federal Employers' Liability Act (FELA), 45 U.S.C. § 51 *et seq*., was the exclusive remedy available to Reidelbach.  We reverse and remand.

## ISSUE

¶2  The single issue in this case is whether BNSF's post-injury claims-handling practices are exempt from application of all state and federal law.

## FACTUAL BACKGROUND

¶3  A short summary of the facts relevant to this case follows.  More detailed facts will be presented as the issues are analyzed and discussed.  As further explained below, because this matter was disposed of on a motion to dismiss, we will construe the facts in a light most favorable to Reidelbach.

¶4  Reidelbach worked for BNSF and its predecessor for approximately twenty years.  During those years, Reidelbach was assigned numerous tasks involving frequent manual heavy lifting.  The frequent strain of lifting or maneuvering loads of 200 to 300 pounds resulted in several back injuries to Reidelbach over the years.  Ultimately in December 1998, Reidelbach was forced to stop working due to disabling cumulative spinal injuries.  He underwent extensive and invasive spinal surgery in 1999.

¶5  Shortly thereafter, BNSF, through its claims' representative, Scott Jacobsen, offered Reidelbach an agreement under which Reidelbach would forego pursuing his legal rights under the FELA and in return BNSF would propose a "fair settlement" with him for his injury.  As part of this

2

agreement, Reidelbach would allow BNSF to oversee his medical treatment. Additionally, BNSF would pay him advance wages, even though he was unable to work. These advance wages would be deducted from Reidelbach's settlement when it was executed. Such a settlement would allow Reidelbach to escape the stress and expense associated with litigating his rights under the FELA and assure him wages with which to support his family in the interim.

¶6 Over the next two years, BNSF paid advance wages, oversaw Reidelbach's medical care and advised him on the value and merits of his claim against BNSF. Despite requests by Reidelbach, however, no settlement offer was made. Jacobsen ultimately advised Reidelbach, but without making an offer, that a fair settlement for his injury would be approximately $280,000.

¶7 As the months continued to pass, Reidelbach experienced increasing difficulty in reaching Jacobsen to discuss his case. Finally, in the fall of 2000, failing any firm settlement offer from BNSF, Reidelbach offered to settle his claim for $450,000. Jacobsen rejected the offer and, according to Reidelbach, stated that the railroad would never pay that amount. Reidelbach, believing that Jacobsen's previously-mentioned $280,000 figure was unreasonably low, and realizing that the three-year statute of limitations for his FELA claim was soon to expire, filed his lawsuit on December 1, 2000. In addition to stating a FELA injury claim, Reidelbach also brought several separate state law claims alleging that BNSF had engaged in unfair, dilatory and fraudulent claims practices. Upon being served with Reidelbach's Complaint, BNSF discontinued Reidelbach's wage advances, leaving Reidelbach with no means to support his family.

¶8 In his Complaint, Reidelbach alleged that BNSF, through Jacobsen, engaged in claims practices that were in violation of state law and that such practices constituted intentional and malicious misconduct. Reidelbach maintained that BNSF, as a sophisticated litigator with a

3

sophisticated claims adjustment department, was in a superior claims negotiating position; that BNSF, through access to his medical records, was aware of the magnitude and severity of Reidelbach's injures; that BNSF was familiar with other similar claims in which BNSF was required to pay considerably higher awards than the amount suggested to Reidelbach; and that it was aware of the vulnerability of Reidelbach's economic position and his inability to support his family without BNSF's wage advances. Reidelbach also argued that BNSF provided inaccurate legal advice as to Reidelbach's likelihood of recovery under his FELA lawsuit.

¶9 Reidelbach further alleged that BNSF's suggestion that his claim was worth approximately $280,000 intentionally misled him as to the value of his claim because Jacobsen had knowingly excluded legitimate damages for pain and suffering, loss of non-vocational activities, and loss of services and future medical care, and had not calculated his recovery using the higher present value of his future earning capacity.

¶10 Reidelbach claimed that BNSF's and Jacobsen's actions constituted (a) bad faith in claims practices which is prohibited by *Brewington v. Employers Fire Ins. Co.*, 1999 MT 312, 297 Mont. 243, 992 P.2d 237; (b) a violation of the common law obligation of good faith and fair dealing inherent in every contract involving a special relationship as recognized in *Story v. City of Bozeman* (1990), 242 Mont. 436, 791 P.2d 767; (c) a violation of the obligation to refrain from malicious and fraudulent conduct as prohibited by § 27-1-221, MCA; and (d) a violation of Reidelbach's constitutional right to a "speedy remedy" for "all" injuries without "sale, denial, or delay," as provided by Article II, Section 16 of the Montana Constitution. Reidelbach sought damages for past and future emotional distress resulting from the railroad's claims-handling tactics, punitive damages to punish BNSF and deter it from engaging in similar bad faith tactics with other injured and

4

vulnerable employees, and the imposition of sanctions for the violation of his constitutional right to a speedy remedy.

¶11    BNSF countered that the FELA is the exclusive remedy available to injured railroad workers employed in interstate commerce, and that as such, the FELA preempts state tort law. Moreover, BNSF argued that the FELA does not offer any remedy for Reidelbach's post-injury claims-handling complaints. It claimed that Reidelbach therefore had no remedy for his claims under either state tort law or federal FELA law. On these bases, BNSF moved to dismiss Reidelbach's claims-handling causes of action.

¶12    Reidelbach contested the motion to dismiss, claiming that his state tort actions are not preempted by the FELA because none of the elements necessary for a FELA claim are present: his state claims are for non-physical injuries received at a time when Reidelbach was not actively employed by the railroad and therefore was not performing work-related duties in furtherance of interstate commerce; the BNSF claims' agent was not engaged in an activity advancing interstate commerce; and his damages were not caused by BNSF's negligence but rather were intentionally inflicted.

¶13    The District Court concluded that all of Reidelbach's post-injury state claims were preempted by the FELA and dismissed them under Rule 12(b)(6), M.R.Civ.P. Reidelbach appeals. We reverse and remand for proceedings consistent with this Opinion.

### STANDARD OF REVIEW

¶14    Our standard of review of district court rulings on motions to dismiss under Rule 12(b)(6), M.R.Civ.P., is:

> A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which

5

would entitle him to relief. A motion to dismiss under Rule 12(b)(6), M.R.Civ.P., has the effect of admitting all well-pleaded allegations in the complaint. In considering the motion, the complaint is construed in the light most favorable to the plaintiff, and all allegations of fact contained therein are taken as true.

*Finstad v. W. R. Grace & Co.,* 2000 MT 228, ¶ 24, 301 Mont. 240, ¶ 24, 8 P.3d 778, ¶ 24 (citation omitted). The District Court's determination that Reidelbach's state law claims failed to state a claim for which relief was available is a conclusion of law. Our standard of review of a court's conclusion of law is whether the tribunal's interpretation of the law is correct. *Finstad*, ¶ 24 (citation omitted).

## DISCUSSION

¶15 The sole issue before this Court is whether BNSF's claims-handling practices are exempt from application of all state and federal law.

¶16 **The parties do not dispute that the FELA provides the sole remedy for physical injuries sustained by a railroad employee, any part of whose duties further interstate commerce, who is injured on-the-job as a result of the negligence of an employer. What Reidelbach asserts here is that, in addition to the physical injuries he sustained while working for BNSF, he also sustained non-physical injuries three years *after* he had ceased performing work for BNSF. Because he was not performing work for the railroad at the time these injuries were inflicted, he argues, the injuries did not occur "during the scope of employment" nor at a time in which he was performing duties in furtherance of interstate commerce, and thus, the FELA has no application to these injuries. While the phrases "during the scope of employment" and "performing duties**

6

**in furtherance of interstate commerce" have been broadly defined[1], Reidelbach in essence contends they cannot possibly be interpreted so as to apply to a person who has performed no work-related activities as an employee for the railroad for the three years preceding the infliction of the injury of which he now complains.**

**¶17   We look first to federal law to determine whether the FELA preempts Reidelbach's post-physical injury claims that arise from BNSF's claims-handling practices and, if so, whether the federal statute offers Reidelbach a remedy.**

¶18    The FELA was originally enacted in 1906, Pub.L.No. 59-219, 34 Stat. 232, but was declared unconstitutional in *Howard v. Illinois Cent. R.R.* (1908), 207 U.S. 463.  Congress returned to the congressional drawing board and reenacted it in 1908.  Pub.L.No. 60-100, 35 Stat. 65.  In 1910, the FELA was amended to allow suit to be brought in both federal and state court, Pub.L.No. 61-117, 36 Stat. 291, codified at 45 U.S.C. § 56, and in 1939, it was further amended to eliminate the defense of assumption of the risk.  Pub.L.No. 76-382, 53 Stat. 1404, codified at 45 U.S.C. § 54.  The law has remained unchanged since that time.

¶19    At the time the FELA was enacted and reenacted, the railroads were a major industry in the United States and as such employed great numbers of people.  These employees were exposed to many dangers and risks associated with railroading but had little protection or recourse from work-related injury or death and were frequently denied redress for their injuries by antiquated common-

---

[1] *Reed v. Pennsylvania R. Co.* (1956), 351 U.S. 502, 76 S.Ct. 958, 100 L.Ed. 1366; *Edwards v. Baltimore & O.R. Co.* (7th Cir. 1942), 131 F.2d 366; *Southern Pac. Co. v. Libbey* (9th Cir. 1952), 199 F.2d 341.

law rules favoring employers. *Rogers v. Consolidated Rail Corp.* (2nd Cir. 1991), 948 F.2d 858. Congress therefore created the FELA "in response to the rising toll of serious injuries and death among workers in the railroad industry." *Harris-Scaggs v. Soo Line R. Co.* (Wis. 1998), 2 F.Supp.2d 1179. The liability section of the FELA states that "every common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed by such carrier. . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier . . . ." *Harris-Scaggs*, 2 F.Supp.2d at 1181 (*citing* 45 U.S.C. § 51). Thus, FELA modified or eliminated the common-law defenses that had previously precluded railroad employees from recovering from their employers for injuries sustained during the course of employment. *Rogers*, 948 F.2d at 861. As a consequence of the provisions of the FELA, injured workers, or the families of deceased workers, could obtain compensatory relief for the worker's injury or death, and the railroads were encouraged to provide their employees with a safe working environment as a means of avoiding liability.

¶20 Courts since 1908 have broadly interpreted the FELA in an effort to honor the Congressional intent of the Act, which was to protect railroad workers and to provide assured compensation for those workers injured by the negligence of their railroad employer. The question we must answer in the case at bar is just how broadly the FELA is to be interpreted, and whether and when it will preempt state tort claims.

*Preemption*

¶21 It is important to begin any discussion of preemption with the recognition that both the United States Supreme Court and this Court have consistently held that preemption is not easily favored. "**Because the States are independent sovereigns in our federal system, we**

**have long presumed that Congress does not cavalierly pre-empt state law causes of action. In all pre-emption cases, . . . we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."** *Favel v. American Renovation and Construction Co.*, **2002 MT 266, ¶ 39, _____ Mont. _____, ¶ 39, ___ P.3d ___, ¶ 39** (citing *Sleath v. West Mont Home Health Services,* 2000 MT 381, ¶ 23, 304 Mont. 1, ¶ 23, 16 P.3d 1042, ¶ 23; *Medtronic, Inc. v. Lohr* (1996), 518 U.S. 470, 485, 116 S.Ct. 2240, 2250, 135 L.Ed.2d 700). This presumption against preemption "can only be overcome by evidence of a clear and manifest intent of Congress to preempt state law." *Favel*, ¶ 39 (citing *Sleath, ¶* 23).

¶22     As this Court explained in *Favel, ¶* 40*:*

> In determining whether a federal law preempts a state law, including a common law cause of action, we must determine whether Congress intended the federal law to preempt state law. There are three ways in which state law may be superseded by federal law. First, the legislature may expressly include in the federal statute a preemption clause, making it clear that state law will not apply in the area governed by the federal statute. Second, congressional intent to preempt state law in a particular area may be implied where the regulation of the area is so comprehensive that it is reasonable to conclude that Congress intended to "occupy the field" and to leave no room for supplementary state regulation. Lastly, federal law may supersede state law when the state law actually conflicts with the federal law. This type of conflict manifests itself as an inability to comply with both the federal and state law, or because "the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Favel*, ¶ 40 (citing ***Hillsborough County v. Automated Medical Labs.* (1985), 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714, 721;** *see also Suislaw Concrete Const. v. Wash., Dept. Of Transp.* **(9th Cir. 1986), 784 F.2d 952, 955).**

*Express Preemption*

¶23     We first consider express preemption. The FELA does *not* contain an express state law

preemption clause; therefore, we will not categorically presume that Congress intends the FELA statute to preempt state law. As the U.S. District Court in Wisconsin noted:

> The absence in the FELA of express federal preemption of other tort actions reflects the Act's distinct legislative goal. . . . [t]he FELA established a *fault-based* notion of liability [as opposed to the strict liability in workers' compensation statutes], aimed at encouraging higher safety standards in the especially treacherous railroad industry (citation omitted). Thus, although railroads had no recourse to common-law defenses, injured employees still had to prove negligence in order to recover, giving employers an enhanced incentive to maintain safe working environments. Conversely, although railroad workers injured on the job were not guaranteed financial recovery, their ability to bring other actions against their employers was not so severely limited by statutory decrees.

**Harris-Scaggs, 2 F.Supp.2d at 1181(emphasis in original).**

¶24 Moreover, as we stated in *Favel*, when Congress intends a statute to supersede state laws, it knows how to say so and does so expressly. *See, e.g.,* Employee Retirement Income Security Program, 29 U.S.C. § 1144(a) (2001) ("Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this chapter."). *See also,* Federal Election Campaign Act, 2 U.S.C. § 453 (2001); Uniform Time Act of 1966, 15 U.S.C. § 260(b) (2001); Armored Car Industry Reciprocity Act, 15 U.S.C. § 5903 (2001). *Favel*, ¶ 41.

***Implied Preemption***

¶25 Because the FELA does not by its terms expressly preempt state law claims, we next consider whether preemption is implied through federal "occupation of the field." Such implied preemption can be based on the existence and comprehensiveness of administrative regulations or be contained in the statute's "structure and purpose." *Fidelity Federal Sav. & Loan Assn. v. De La Cuesta* (1982), 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (quoting *Jones v. Rath Packing Co.*

(1977), 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604). Unlike most other federal statutory schemes, the FELA has *no* underlying administrative regulations. Therefore we cannot imply preemption through administrative regulation.

¶26 We look then for Congressional intent to preempt based on the "structure and purpose" of the FELA. For the "structure and purpose" of the FELA to imply a Congressional intent to preempt, "the Act of Congress [must] touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Rice v. Santa Fe Elevator Corp.* (1947), 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447 (citing *Hines v. Davidowitz* (1941), 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581). The plain language of the FELA reveals that Congress' purpose was to enact a compensatory scheme under which railway employees who were physically injured by the negligence of their employer while on-the-job and in pursuit of **interstate commerce could obtain relief. This Congressional purpose simply does not contemplate, much less imply that Congress intended to regulate through the FELA the entire field of injuries and claims a railroad employee may have. See *Pikop v. Burlington Northern R. Co.* (Minn. 1986), 390 N.W.2d 743, cert. denied, 107 S.Ct. 1616 (1987). We therefore conclude that the FELA does not so pervasively "occupy the field" of recovery for injured railroad employees as to preempt all supplemental state remedies. Reidelbach's claims of intentionally-inflicted, non-physical injury experienced outside the scope of his employment are outside the scope of the railroad's FELA regulation and are not impliedly preempted by the FELA.**

¶27 Given that the structure and purpose of the FELA as revealed by its language do not

imply a Congressional intent to preempt the type of injury claimed of in the case at bar <u>and</u> there are no administrative regulations underlying the FELA, we are hard-pressed to conclude, as the *Hillsborough County* Court would have us do, that ". . . regulation of the area is so comprehensive that it is reasonable to conclude that Congress intended to 'occupy the field' and to leave no room for supplementary regulations." *Favel*, ¶ 40 (citing *Hillsborough County*, 471 U.S. at 713). We are therefore compelled to move to the third and final method for determining whether Congress intended the federal law to preempt state law, and that is to analyze whether the state law upon which the claimant relies " . . . actually conflicts with the federal law." *Favel*, ¶ 40 (citing *Hillsborough County*, 471 U.S. at 713).

*Conflict Preemption*

¶28 There are two types of conflict preemption: (1) "where it is impossible to comply with both state and federal requirements"; and (2) "where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Williamson v. General Dynamics Corp.* (9th Cir. 2000), 208 F.3d 1144, 1149 (citing *Industrial Truck Ass'n, Inc. v. Henry* (9th Cir. 1997), 125 F.3d 1305, 1309). "In determining whether a state law conflicts with federal statutes or regulations, the federal-state conflict must be actual and unavoidable, not merely possible." *Seigel v. American Sav. & Loan Ass'n* (1989), 210 Cal.App.3d 953, 963, 258 Cal.Rptr. 746, 752 (citation omitted). Additionally, courts must "determine whether, under the circumstances of [a] particular case, [that State's] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Jones*, 430 U.S. at 526 (citations omitted).

12

**¶29** The issue of bad faith claims-handling practices of an FELA claim by a railroad employer has not been widely litigated. In fact, an extensive multi-jurisdictional **search reveals few cases in which the issue has been presented, and only one case in which the merits of the bad faith claim were analyzed in any detail. Ironically, this case arose here in Montana.**

**¶30** In *Toscano v. Burlington Northern R. Co.* (D. Mont. 1987), 678 F.Supp. 1477, an employee of Burlington Northern sought relief under the FELA for emotional injury precipitated by threats, harassment, intimidation and/or discrimination inflicted upon her by co-workers. Toscano's FELA claim for emotional injuries withstood a dismissal challenge by Burlington Northern in which the railroad claimed that a wholly emotional/mental injury was not cognizable under the FELA. Toscano also claimed, in rather general terms, that Burlington Northern breached its common law duty of "good faith and fair dealing" in the undertaking of its claim-settlement practices. (It is worth noting that Toscano did not expressly characterize this breach of duty as an *intentional* tort. Additionally, and unlike the case before us, Burlington Northern allegedly committed this claimed breach of duty at a time when Toscano was still actively employed by Burlington Northern.) While the District Court appeared intrigued by Toscano's argument that her claim-settlement practices claim should go forward under common law, it nonetheless concluded, partly based on lack of cited authority, that the FELA preempted her state common law claims. The court stated that "[t]he FELA presents the exclusive remedy in all actions falling within the ambit of the Act, to the exclusion of the common and statutory law of the several states." *Toscano*, 678 F.Supp. at 1479.

**¶31** The *Toscano* Court concluded that "[t]he desire for uniformity which prompted Congress to enact the FELA" precluded imposing liability on BNSF "for actions relating to an FELA claim" when such liability arose from breach of a duty created by state law. ***Toscano*, 678 F.Supp. at**

13

**1479.**

¶**32**    While the *Toscano* Court prohibited a state tort claim for what was essentially an intentionally inflicted harm, some jurisdictions have concluded that the FELA does not preempt intentional state tort claims proffered by injured railroad employees.  In 1986, the Minnesota Supreme Court issued an opinion resolving two lower court rulings, one involving Virginia Pikop and another involving Romesh Gulati.  The Court's decision in *Pikop*, 390 N.W.2d 743, is instructive here.

¶**33**    **In 1981, Burlington Northern employed Virginia Pikop for a brief period of time.  During her employment with Burlington Northern, Pikop endured sexual assault, harassment and threatening behavior from her supervisor and co-workers.  She diligently pursued legal recourse for her injuries, bringing separate actions in both state and federal court.  In her Federal District Court case she sought to recover both under the FELA and under state law on her claims of intentional infliction of emotional distress.  The Federal District Court agreed with Burlington Northern's argument that Pikop's state claims were preempted by the FELA and dismissed them, but allowed her FELA claim to proceed.  Pikop then attempted to pursue her state claims against both the railroad and her former co-workers in State District Court.  The State Court also dismissed her state law claims on the ground they were preempted by the FELA.  The Minnesota Supreme Court granted accelerated review.  *Pikop*, 390 N.W.2d 743.**

¶**34**    Romesh Gulati was also employed by Burlington Northern in Minnesota.  After experiencing an on-the-job physical injury for which he brought a FELA claim that was ultimately settled, Gulati

14

allegedly began experiencing harassment from both Burlington Northern management and co-workers. He endured racial slurs, unprovoked assaults and investigations. He was ultimately fired. Gulati then brought an action for breach of his FELA settlement, wrongful discharge, and intentional infliction of emotional distress in the same state court as had Pikop. **The State District Court dismissed Gulati's claims for breach of settlement and wrongful discharge, concluding that these claims were preempted by the Railway Labor Act (RLA), 45 U.S.C. §§ 151-63.[2] The court, however, declined to dismiss the emotional distress claim. Rather, it requested guidance by submitting to the Minnesota Court of Appeals the following certified question, "[d]oes the RLA and/or FELA preempt state court jurisdiction over plaintiff's claim of intentional infliction of emotional distress?" The Minnesota Court of Appeals answered this question "no."** *Pikop*, 390 N.W.2d 743.

¶35 Burlington Northern appealed this resolution of Gulati's claim by the Minnesota Court of Appeals to the Minnesota Supreme Court. In addition, Pikop appealed the dismissal of her state claims. The Minnesota Supreme Court consolidated these cases for consideration. *Pikop*, 390 N.W.2d 743. After a careful review of FELA-related cases from multiple jurisdictions, the Court concluded Pikop's state claims were <u>not</u> preempted by the FELA. The Court further concluded that the Minnesota Court of Appeals correctly ruled that the FELA did not preempt Gulati's state claim for intentional infliction of emotional distress.

¶36 The Minnesota Supreme Court explained that the FELA provides no express preemption

---

[2] Congress enacted the RLA to promote stability in labor-management relations by providing a comprehensive framework for "the prompt and orderly settlement" of both "major" and "minor" labor disputes. *Atchison, T. & S. F. R. Co. v. Buell* (1987), 480 U.S. 557, 562, 107 S. Ct. 1410, 94 L. Ed. 2d 563; see also 45 U.S.C. § 151a.

15

clause nor does it impliedly preempt the state claims for intentional torts. The Minnesota Supreme Court determined that affording the railway employees the state tort remedy of intentional infliction of emotional distress "will not . . . frustrate the fault-based scheme of the FELA. The state tort action would not impose strict liability, but instead would apply common law principles of fault," as does the FELA. *Pikop*, 390 N.W.2d 743. Significantly, the U.S. Supreme Court denied certiorari of *Pikop*.

¶37    *Pikop* stands for the proposition that one may pursue a state tort claim for intentional infliction of emotional injury when such injury was inflicted while the employee was *on-the-job* performing the duties for which he or she was hired. In other words, at least one of the elements of a FELA case existed--Pikop and Gulati were both on-the-job, presumably furthering interstate commerce, when their employer committed the intentional tort. Reidelbach's claim is one step removed from Pikop's and Gulati's, in that he was not physically working for BNSF when his claims arose. Thus, in his case, *no* elements of a typical FELA claim exist.

¶38    Other jurisdictions have looked to *Pikop* for guidance in analyzing intentional tort claims brought in conjunction with FELA actions. In *Monarch v. Southern Pacific Transp. Co.* (1999), 70 Cal.App.4th 1197, 83 Cal.Rptr.2d 247, the California Court of Appeals was presented with a claim by an injured railroad worker who had suffered hearing loss as a result of long-term exposure to train noises. In addition to stating an FELA claim, Monarch argued that the railroad intentionally and fraudulently concealed the risk of noise-related injury in violation of state law. The Court of Appeals affirmed the lower court's ruling that Monarch's claim of intentional injury was preempted by the FELA. However, the Court's analysis has significance here. The Court explained:

> [Monarch's] action against [Southern Pacific] for fraudulent concealment of the dangers of excessive noise is essentially one for failure to provide a safe place to

16

work or failure to warn of known risks, both of which are authorized by the FELA. (citation omitted) Further, [Monarch] seeks recovery for compensable physical injuries under the FELA . . . [making] his case distinguishable from an intentional tort action for merely *emotional harm*, which is excluded from the coverage of the FELA, and was for that reason found *not* preempted by the federal statute in *Pikop*. . . (emphasis in original).

*Monarch*, 70 Cal.App.4th at 1209.

¶39    Reidelbach's case shares important similarities with the above-described cases and even more significant differences.  As did Reidelbach (taking as true his allegations pursuant to Rule 12(b)(6)), Toscano, **Pikop and Gulati each suffered a non-physical injury, *i.e.*, emotional distress, inflicted not negligently but intentionally, by BNSF's management and/or employees. Unlike Reidelbach, Toscano, Pikop and Gulati were all active employees of BNSF at the time of their injuries and were performing their jobs in furtherance of interstate commerce.  Reidelbach, on the other hand, claims injury by BNSF years after he had stopped working for BNSF and when Reidelbach was no longer engaged in activities that furthered interstate commerce.**

¶40    Conversely, Monarch experienced a physical injury while on-the-job when both he and Southern Pacific were actively engaged in interstate commerce.  This injury fell squarely within the realm of the FELA and in its analysis, the California Court expressly recognized the difference between FELA coverage of a negligently-inflicted physical injury and such coverage of an intentionally-inflicted emotional injury--the first is covered and the latter is not.

¶41    BNSF argues that this Court should be guided here by the numerous **cases deciding that a release of an FELA claim signed by an injured railroad worker is governed exclusively by the FELA.  It urges us to apply *Dice v. Akron, C. & Y. R. Co.* (1952), 342 U.S. 359, 72**

17

**S.Ct. 312, 96 L.Ed. 398, where the U.S. Supreme Court concluded, *inter alia*, that federal law, not state law, governs the validity of FELA releases.**

¶42    The *Dice* Court explained:

> [The] validity of releases under the Federal Employers' Liability Act raises a federal question to be determined by federal rather than state law. Congress in § 1 of the Act granted [an injured employee] a right to recover against his employer for damages negligently inflicted. State laws are not controlling in determining what the incidents of this federal right shall be. [citation omitted] Manifestly the federal rights affording relief to injured railroad employees under a federally declared standard could be defeated if states were permitted to have the final say as to what defenses could and could not be properly interposed to suits under the Act. Moreover, only if federal law controls can the federal Act be given the uniform application throughout the country essential to effectuate its purposes. [citation omitted] Releases and other devices designed to liquidate or defeat injured employees' claims play an important part in the federal Act's administration. [citation omitted] Their validity is but one of the many interrelated questions that must constantly be determined in these cases according to a uniform federal law.

*Dice*, 342 U.S. at 361-62.

¶43    BNSF argues that *Dice* and its progeny control in the case at bar and therefore Reidelbach's state claims were correctly dismissed. Significantly, BNSF further asserts that while all claims negotiation or settlement procedures are controlled by the FELA, the FELA does not provide a remedy for a claim that such procedures were conducted in a dilatory or fraudulent manner that resulted in additional harm to a physically injured employee. BNSF, therefore, declares that Reidelbach's claims fall within the category of *damnum absque injuria*, *i.e.,* "a loss which does not give rise to an action for damages against the person causing it."

¶44    Certainly we recognize that *damnum absque injuria* claims exist, but Reidelbach's grievances do not fall into this category. *Dice* and its offspring, including *Counts v. Burlington Northern R. Co.* (9th Cir. 1990), 896 F.2d 424, are distinguishable from the case at bar in one important detail-- Reidelbach did not enter into a release agreement with BNSF. This is a critical distinction because

18

an executed release actually defines and potentially compromises the amount of damages an injured employee receives for his or her physical injury; it establishes negligent liability and assigns a monetary value to the work-related injury. It does exactly what a FELA court proceeding would do if the proceeding was held. It is for this reason that a release is linked inextricably to the FELA claim. We do not have that link in the case at bar. Reidelbach's state claims are distinct and separate from his physical injury FELA claim, the value of which will be decided in court under FELA law. The railroad's settlement practices do not arise from the railroad's negligence in the workplace, and will not influence the amount of FELA recovery Reidelbach might receive when he has his day in court. Conversely, proof of Reidelbach's physical, on-the-job injury and the railroad's alleged negligence are not elements of Reidelbach's state claims and will not affect the value of or damages for his state claims. The "FELA release" cases cited by BNSF, therefore, are distinguishable from the case at bar and inapposite.

¶45    While we find "release" cases to be inapplicable, we conclude that the preemption test developed in *Farmer v. Carpenters* (1977), 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338, can be applied to a FELA preemption analysis. This test has been applied in several instances to labor-related cases involving the National Labor Relations Act (NLRA), the Labor Management Relations Act (LMRA), and the RLA, but we find no cases in which it has been applied to the FELA. And while we recognize the significant differences between these statutes and the FELA, we see no reason why the *Farmer* preemption test cannot serve in FELA cases as well.

¶46    In *Farmer*, Hill, a carpenter and union member, was elected to a three-year term as vice president of the union. Shortly thereafter, a dispute arose between Hill and the union business agent

19

and other union officials over union policy. As a result of this disagreement, the union began actively discriminating against Hill in job referrals and Hill was subjected to a campaign of personal abuse and harassment. He brought an action seeking damages from the Union and several other union-related parties for causing him "to suffer grievous emotional distress resulting in bodily injury." A jury in Los Angeles County's Superior Court returned a verdict for actual and punitive damages. The California Court of Appeals reversed, concluding that the case was within the exclusive jurisdiction of the NLRB. The California Supreme Court denied review but the U.S. Supreme Court granted certiorari. (Hill died before the case was resolved and Farmer, as administrator of his estate, was substituted for petitioner in the case.)

¶47    In *Farmer*, the Court developed the following test for determining if a claim brought under state law was preempted by the NLRA:

1.    Was the underlying act or conduct protected or permitted by the federal statute?

2.    Did the State have "an overriding state interest" in protecting its citizens from the complained of actions and was the state's interest "deeply rooted in local feeling and responsibility?" and

3.    What was the risk that the state cause of action would interfere with the effective administration of the national labor policy?

*Farmer*, 430 U.S. at 298.

¶48    The *Farmer* Court concluded that the outrageous and abusive conduct complained of by Hill was not protected under any provision of the NLRA[3]. The State of California, on the other hand,

---

[3]The Court did not establish criteria to define the level of outrageousness or abuse that must be inflicted to warrant preemption but implied that such conduct must be severe. *Farmer*, 430 U.S. at 305.

20

had a substantial interest in protecting it citizens from the kind of abuse of which Hill complained, and that "interest is no less worthy of recognition because it concerns protection from emotional distress caused by outrageous conduct, rather than protection from physical injury. . . ." *Farmer*, 430 U.S. at 302 (citations omitted). Additionally, the Court found significant that the state-court tort action could be adjudicated without resolution of the "merits" of the underlying labor dispute.

¶49 The Ninth Circuit Court of Appeals has applied the *Farmer* test in several cases, some of which have resulted in federal preemption and some of which have not. *See Radcliffe v. Rainbow Const. Co.* (9th Cir. 2001), 254 F.3d 772 (state law torts of false arrest and malicious prosecution not preempted by the NLRA); *Sever v. Alaska Pulp Corp.* (9th Cir. 1992), 978 F.2d 1529 (intentional infliction of emotional distress does not allege conduct covered by collective bargaining agreement, and is therefore not preempted by NLRA). *See also*, *Beers v. Southern Pacific Transp. Co.* (9th Cir. 1983), 703 F.2d 425 (complained of harassment was identical to what could have been presented to National Railroad Adjustment Board (NRAB) and was substantially related to the collective bargaining agreement; therefore, state claims were preempted by federal labor law); *Magnuson v. Burlington Northern, Inc*. (9th Cir. 1978), 576 F.2d 1367 (injury complained of fell within the express jurisdiction of the RLA and therefore was not available as a state tort action).

¶50 The *Farmer* test was also applied by this Court in *Malquist v. Foley* (1986), 220 Mont. 176, 714 P.2d 995. In *Malquist*, some union electricians were blacklisted from future employment by various employers. The State District Court dismissed the electricians' claims for lack of subject matter jurisdiction, holding that the NLRA preempted state regulation of the employers' actions. This Court, reversing and remanding, held that because "[b]lacklisting per se is proscribed in Montana" under the test developed in *Farmer,* and its predecessor *San Diego Unions v. Garmon*

(1959), 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775, Malquist and his fellow electricians could pursue their state tort action.

¶51 Applying this test to the case at bar, BNSF's actions complained of by Reidelbach in his state law tort claims are neither protected nor prohibited by the FELA; the State has an overriding interest in protecting its citizens from fraudulent, malicious and bad faith claims practices and the infliction of intentional emotional injury (Uniform Trade Practices Act, § 33-18-101, *et seq.,* MCA; *Brewington*, 1999 MT 312, 992 P.2d 237; *Story*, 242 Mont. 436, 791 P.2d 767; and § 27-1-221, MCA);  and there is virtually no risk that the state cause of action would interfere with the effective administration of the FELA.

**¶52 Compliance with the state laws upon which Reidelbach bases his state claims and compliance with the FELA are not mutually exclusive.  The railroad can easily satisfy both its duty and obligation to provide a safe working environment for its employees under the FELA, and its state-imposed obligation to engage in fair, good faith claims practices once an employee has been injured.  In fact, in a perfect world, the manner in which an individual railroad employer handles the claim of an injured worker would theoretically be uniform--every such claim would be handled honestly, promptly and in good faith.  But good faith was not what the FELA was created to accomplish. Therefore, imposition of that obligation is neither within "the ambit of the federal statute" nor does it conflict with or stand as an obstacle to the accomplishment and execution of the purpose or objective of the FELA.  As such, imposing such obligations through enforcement of state statutes or state common law is not preempted.**

22

¶53 Moreover, given the humanitarian purpose of the FELA, **we find it inconceivable, as have several courts before us, that Congress intended the FELA to cover only certain railroad worker injuries while absolutely precluding any remedy for others. See** *Mack v. Metro-North Commuter R.R.* **(S.D.N.Y. 1995), 878 F.Supp. 673, 677 ("As FELA was enacted to compensate injured railroad employees fully, it would not serve Congressional intent to dismiss . . . state law claims because of pre-emption by a statute which may not remedy those claims.");** *Rogers v. Consolidated Rail Corp*. **(N.D.N.Y. 1988), 688 F.Supp. 835, 839 ("[I]t is inconceivable that Congress intended the FELA to preempt an injured railroad worker from seeking a remedy under state law when the FELA itself is not applicable and does not provide a remedy. The only reasonable inference is that Congress intended to permit such a worker to seek recovery elsewhere." (***citing Wabash R. R. v. Hayes*** (1914), 234 U.S. 86, 34 S.Ct. 729, 58 L.Ed. 1226, which stated, "If the injury occurred outside of interstate commerce, the FELA was without application and the law of the state is controlling.")). The fact that the railroad workers in both** *Mack* **and** *Rogers* **incurred physical injuries rather than emotional injuries does not diminish the applicability of the underlying legal premise to the case at bar. Finally, "[t]he existence of [a Federal] statutory remedy vastly increases the likelihood that state law remedies interfere with the federal regulation applicable to railroad workers."** *Mayon v. Southern Pacific Transp. Co*. **(5th Cir. 1986), 805 F.2d 1250, 1252. As noted above, and as readily conceded by BNSF, the FELA**

23

**provides no statutory remedy for Reidelbach's claims.**

## CONCLUSION

¶54 **Based on the foregoing, we conclude that the District Court erroneously dismissed Reidelbach's state claims because they are neither expressly nor impliedly preempted by the FELA and do not conflict with or stand as an obstacle to the accomplishment and execution of the FELA.** We therefore reverse and remand with instruction that Reidelbach be allowed to present his state law tort claims.

/S/ PATRICIA COTTER

We Concur:

/S/ KARLA M. GRAY
/S/ W. WILLIAM LEAPHART
/S/ JAMES C. NELSON
/S/ JIM RICE