FILED

03/23/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 19-0343

DA 19-0343

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2021 MT 71

ROBERT DANNELS,

       Plaintiff and Appellee,

  v.

BNSF RAILWAY COMPANY,

       Defendant and Appellant.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. BDV-14-001
Honorable Katherine M. Bidegaray, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Andrew S. Tulumello (argued), Gibson, Dunn & Crutcher LLP, Washington, District of Columbia

          Jeff Hedger, Michelle T. Friend, Hedger Friend, P.L.L.C., Billings, Montana

      For Appellee:

          Deepak Gupta (argued), Lark Turner, Gupta Wessler PLLC, Washington, District of Columbia

          Dennis P. Conner, Keith D. Marr, Conner & Marr, PLLP, Great Falls, Montana

      For Amicus Association of American Railroads:

          Anthony M. Nicastro, Knight Nicastro MacKay, LLC, Billings, Montana

      For Amicus Washington Legal Foundation:

          Mark D. Parker, Samantha A. Howard, Parker, Heitz & Cosgrove, PLLC, Billings, Montana

1

Argued and Submitted:  June 10, 2020

Decided:  March 23, 2021

Filed:

_____
Clerk

Justice James Jeremiah Shea delivered the Opinion of the Court.

¶1    Defendant and Appellant BNSF Railway Company (BNSF) appeals the orders of the Eighth Judicial District Court, Cascade County, denying BNSF summary judgment and entering final judgment in favor of Plaintiff and Appellee Robert Dannels.  We address the following issue:

> *Does the Federal Employers' Liability Act preempt an injured railroad employee's State law bad faith claims?*

¶2    We affirm.

## PROCEDURAL AND FACTUAL BACKGROUND

¶3    Dannels was employed by BNSF as a Maintenance of Way laborer and equipment operator in northern Montana from approximately 1990 to 2010.  On March 17, 2010, Dannels was assigned to operate a Bobcat skidsteer to remove snow piles from a parking lot in BNSF's Havre railroad yard.  The front-end of the skidsteer collided with a steel wellhead concealed under a snow pile.  As a result of the collision, Dannels suffered a disabling back and spine injury which required medical care.

¶4    On December 6, 2010, Dannels sued BNSF under the Federal Employers' Liability Act (FELA) to recover damages for his work-related injury.  Dannels alleged that throughout his employment, BNSF negligently assigned him physical work activities that caused "cumulative trauma" to his lower back and spine and made him susceptible to permanent disability.

¶5    Before trial, BNSF moved in limine to preclude Dannels from referencing any "emotional distress not directly tied to [Dannels'] physical injury."  The motion was

3

granted and the District Court instructed the jury that it could only award damages "caused by the event in question," specifically "injuries . . . sustained as a consequence of physical impact."

¶6    On February 13, 2013, a jury returned a verdict in Dannels' favor in the amount of $1.7 million. The jury found BNSF to be 100% at fault and Dannels to be 0% at fault.

¶7    During the pendency of Dannels' FELA claim, he never sought advance payment from BNSF of either his medical expenses or his lost wages, nor did he file a declaratory judgment action seeking a declaration of BNSF's obligations in that regard.  After the verdict, but before the final judgment was entered, Dannels submitted a written request to BNSF, seeking payment of the portion of the jury verdict that represented his past lost wages.  BNSF refused.  After BNSF's motion for a new trial was denied, it paid the $1.7 million judgment.

¶8    On January 2, 2014, Dannels filed claims for bad faith and punitive damages against BNSF.  He asserted BNSF violated Montana common law and statutory duties of good faith and fair dealing in handling his FELA claim by failing to advance his lost wages, failing to reasonably investigate and adjust his claim, and failing to offer him alternative or permanent employment.  Dannels had originally named the individual claims adjustor and BNSF Insurance Company, Ltd. (BNSF IC) as defendants in his bad faith complaint. Dannels' subsequently voluntarily dismissed the claims adjustor.  On May 13, 2015, BNSF IC filed a motion to dismiss for lack of personal jurisdiction.  BNSF IC acknowledged that it is a wholly owned subsidiary of the same parent company as BNSF, and that it maintains

4

a program of self-insurance in conjunction with BNSF for coverage of FELA claims made by BNSF employees. BNSF IC asserted it has no contacts with the State of Montana because it is a licensed insurance company organized under the laws of Bermuda, a territory of the United Kingdom. The District Court granted BNSF IC's motion.

¶9 On May 1, 2017, BNSF moved for summary judgment, asserting that Dannels' State law bad faith claims were preempted by the FELA. The District Court denied BNSF's motion.

¶10 On February 2, 2018, BNSF filed motions in limine seeking to preclude Dannels from offering evidence or testimony at trial regarding BNSF claims-handling practices or reporting, including evidence or testimony that BNSF had a duty to advance pay Dannels' FELA claim or offer him alternative employment or permanent employment. BNSF argued in its motion that the FELA was the law governing Dannels' underlying claim and does not require railroads to advance pay claimants or offer alternative employment or permanent employment as part of its settlement practices. BNSF further argued that "[e]vidence of other claims or claims handling practices or reporting in other cases is not relevant to the case at bar. [Dannels'] underlying claim and BNSF's claim handling practice is the only relevant issue."

¶11 Before the District Court could rule on BNSF's motions in limine, the parties filed a stipulation for entry of final judgment. BNSF stipulated that judgment be entered against it on Dannels' bad faith claims in the amount of $7.4 million, inclusive of all fees, interest, and costs. BNSF reserved its right to appeal the District Court's denial of its summary

5

judgment motion but stipulated that it would pay Dannels $2.25 million "regardless of the outcome of any appeal." BNSF stipulated that it would pay the $5.15 million balance upon its exhaustion of its appeal rights to this Court and the United States Supreme Court, if its appeals were unsuccessful. On May 14, 2019, the District Court accepted the parties' stipulation and entered final judgment against BNSF.

## STANDARDS OF REVIEW

¶12     We review a district court's summary judgment ruling de novo, applying the criteria set forth in M. R. Civ. P. 56. *Sinclair v. Burlington Northern & Santa Fe Ry.*, 2008 MT 424, ¶ 26, 347 Mont. 395, 200 P.3d 46. Summary judgment is appropriate if the moving party demonstrates from "the pleadings, the discovery and disclosure materials on file, and any affidavits" that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Sinclair*, ¶ 26; M. R. Civ. P. 56(c)(3). Where a district court determines there is no material factual dispute and the moving party is entitled to judgment as a matter of law, we review whether the district court correctly applied the law. *Mont. Immigrant Justice Alliance v. Bullock*, 2016 MT 104, ¶ 28, 383 Mont. 318, 371 P.3d 430; *Sinclair*, ¶ 26. A district court's determination regarding federal preemption is a question of law which we review for correctness. *Mont. Immigrant Justice Alliance*, ¶ 14.

## DISCUSSION

¶13     *Does the Federal Employers' Liability Act preempt an injured employee's State law bad faith claims?*

¶14     The Supremacy Clause of the United States Constitution provides:

6

> This Constitution, and the Laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, anything in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Const. art. VI, cl. 2. The Supremacy Clause "invalidates state laws that 'interfere with, or are contrary to,' federal law." *Hillsborough Cty. v. Auto. Med. Laboratories, Inc.*, 471 U.S. 707, 105 S. Ct. 2371, 85 L. Ed. 2d 714 (1985) (quoting *Gibbons v. Ogden*, 9 Wheat. 1, 211 (1824) (Marshall, C.J.). Congress is empowered by the Supremacy Clause to pass federal acts that supersede state law in three ways: (1) express preemption, (2) field preemption, or (3) conflict preemption, "the latter two being forms of implied preemption." *Mont. Immigrant Justice Alliance*, ¶ 28 (citing *Valle Del Sol Inc. v. Whiting*, 732 F.3d 1006, 1022-23 (9th Cir. 2013)).

¶15 BNSF argues that Dannels' state law bad faith claims are preempted by the FELA. The FELA is a federal act that serves as the "comprehensive" and "exclusive" scheme of recovery for physical injuries suffered on-the-job by a railroad employee, any part of whose duties further interstate commerce, as a result of the negligence of an employer. *See* 45 U.S.C. § 51 ("Every common carrier by railroad while engaging in commerce . . . shall be liable in damages to any person suffering injury while he is employed by such carrier . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier . . . ."); *New York C. R. Co. v. Winfield*, 244 U.S. 147, 151-52, 37 S. Ct. 546, 548, 61 L. Ed. 1045, 1048-49 (1917). The FELA was originally enacted to address "the rising toll of serious

injuries and death among workers in the railroad industry." *Reidelbach v. Burlington N. & Santa Fe Ry. Co.*, 2002 MT 289, ¶ 19, 312 Mont. 498, 60 P.3d 418 (quoting *Harris-Scaggs v. Soo Line R. Co.*, 2 F. Supp. 2d 1179 (Wis. 1998)). *See also Anderson v. BNSF Ry.*, 2015 MT 240, ¶ 35, 380 Mont. 319, 354 P.3d 1248 (quoting *Kernan v. Am. Dredging Co.*, 355 U.S. 426, 432, 78 S. Ct. 394, 398, 2 L. Ed. 2d 382 (1958)) ("'[I]t is clear that the general congressional intent was to provide liberal recovery for injured workers.'"). When the FELA was enacted in 1908, railroading was "a major industry in the United States and as such employed great numbers of people." *Reidelbach*, ¶ 19. Railroad employees "were exposed to many dangers and risks associated with railroading but had little protection or recourse from work-related injury or death and were frequently denied redress for their injuries by antiquated common-law rules favoring employers." *Reidelbach*, ¶ 19 (citing *Rogers v. Consolidated Rail Corp.*, 948 F.2d 858 (2d Cir. 1991)). The FELA provided compensatory relief for injured railroad employees by "modif[ying] or eliminat[ing] the common-law defenses that had previously precluded railroad employees from recovering from their employers for injuries sustained during the course of employment." *Reidelbach*, ¶ 19 (citing *Rogers*, 948 F.2d at 861).

¶16    The Montana Unfair Trade Practices Act (UTPA) allows a person to seek damages from an insurer engaging in unfair and deceptive practices. Section 33-18-101, MCA. UTPA applies to "every person engaged as indemnitor, surety, or contractor in the business of entering into contracts of insurance," § 33-1-201(6), MCA, including "a person, firm, or corporation utilizing self-insurance to pay claims made against them,"

8

§ 33-18-242(8), MCA. *But see Shattuck v. Kalispell Reg'l Med. Ctr.*, 2011 MT 229, ¶ 15, 362 Mont. 100, 261 P.3d 1021 (citing *Ogden v. Mont. Power Co.*, 229 Mont. 387, 392, 747 P.2d 201, 204 (1987)) (Exempting some self-insured entities from the UTPA because they are not "primarily in the business of . . . enter[ing] into insurance contracts."). As we have previously recognized in the context of workers' compensation insurance, an injured employee is considered a third-party claimant even when the employer is self-insured. *Suzor v. Int'l Paper Co.*, 2016 MT 344, ¶ 22, 386 Mont. 54, 386 P.3d 584 ("[A]n injured employee's position as a third-party claimant does not materially change in the context of self-insurance."). The UTPA authorizes a third-party claimant to pursue bad faith claims against the insurer. Section 33-18-242(6)(b), MCA.

¶17 Section 33-18-242(1), MCA, of the UTPA authorizes an insured or a third-party claimant to pursue "an independent cause of action against an insurer for actual damages caused by the insurer's violation of subsection (1), (4), (5), (6), (9), or (13) of [§] 33-18-201[, MCA]." These subsections prohibit an insurer from engaging in the following unfair claim settlement practices:

> (1) misrepresent[ing] pertinent facts or insurance policy provisions relating to coverages at issue;
>
> . . .
>
> (4) refus[ing] to pay claims without conducting a reasonable investigation based upon all available information;
> (5) fail[ing] to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed;
> (6) neglect[ing] to attempt in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear;
>
> . . .

9

(9) attempt[ing] to settle claims on the basis of an application that was altered without notice to or knowledge or consent of the insured;

. . .

(13) fail[ing] to promptly settle claims, if liability has become reasonably clear, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage . . . .

Section 33-18-201(1), (4)-(6), (9), (13), MCA.

¶18 An insurer may also be held liable at common law for bad faith conduct once the underlying claim is resolved. *See Brewington v. Employers Fire Ins. Co.*, 1999 MT 312, ¶ 19, 297 Mont. 243, 992 P.2d 237; *O'Fallon v. Farmers Ins. Exch.*, 260 Mont. 233, 244-45, 859 P.2d 1008, 1015 (1993). An insurer may be held liable for punitive damages if the insurer acted with actual fraud or actual malice in its handling of a claim. *See* §§ 27-1-220 and -221, MCA; *Lorang v. Fortis Ins. Co.*, 2008 MT 252, ¶¶ 90-93, 345 Mont. 12, 192 P.3d 186.

¶19 Dannels has alleged BNSF improperly investigated, adjusted, and defended against his underlying FELA action, thereby violating the common law and statutory duties imposed under Montana's bad faith laws. In determining whether the FELA preempts Dannels' State bad faith claims, we begin with the long-held presumption that "Congress does not cavalierly [preempt] state-law causes of action. In all [preemption] cases, . . . we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of

10

Congress." *Reidelbach*, ¶ 21 (quoting *Favel v. Am. Renovation & Constr. Co.*, 2002 MT 266, ¶ 39, 312 Mont. 285, 59 P.3d 412).

¶20 We begin our inquiry by examining express preemption. "Express preemption occurs when Congress enacts a statute that contains an express preemption provision," *Mont. Immigrant Justice Alliance*, ¶ 29, thereby "making it clear that state law will not apply in the area governed by federal statute." *Favel*, ¶ 40. *See also Hillsborough Cty.*, 471 U.S. at 713, 105 S. Ct. at 2375, 85 L. Ed. 2d at 721. There is no express provision in the FELA manifesting a congressional intent to preempt state laws such as the UTPA. We therefore "will not categorically presume that Congress intends the FELA statute to preempt state law." *Reidelbach*, ¶ 23. We are thus left with an inquiry into implied preemption, beginning with field preemption.

¶21 "Field preemption occurs when 'the States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance.'" *Mont. Immigrant Justice Alliance*, ¶ 29 (quoting *Arizona v. United States*, 567 U.S. 387, 399, 132 S. Ct. 2492, 2501, 183 L. Ed. 2d 351, 369 (2012)). Congress' intent to occupy the field of a particular area of law becomes "evident where there is a 'framework of regulation so pervasive . . . that Congress left no room for the States to supplement it or where there is a federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Mont. Immigrant Justice Alliance*, ¶ 29 (*Arizona*, 132 S. Ct. at 2501, 183 L. Ed. 2d at 369). *See also Favel*, ¶ 40 ("[C]ongressional

11

intent to preempt state law in a particular area may be implied where the regulation of the area is so comprehensive that it is reasonable to conclude that Congress intended to 'occupy the field' and to leave no room for supplementary state regulation.").

¶22 As we recognized in *Reidelbach*, "[u]nlike most other federal statutory schemes, the FELA has *no* underlying administrative regulations. Therefore, we cannot imply preemption through administrative regulation." *Reidelbach*, ¶ 25 (emphasis in original). We must then determine if "[c]ongressional intent to preempt based on the 'structure and purpose'" of the FELA exists. *Reidelbach*, ¶ 26. As we observed in *Reidelbach*, "the plain language of the FELA reveals that Congress' purpose was to enact a compensatory scheme" under which railway employees who suffered occupational injuries caused by the negligence of their employer "and in pursuit of interstate commerce" could obtain redress. *Reidelbach*, ¶ 26. We determined in *Reidelbach* that "[t]his Congressional purpose simply does not contemplate, much less imply, that Congress intended to regulate through the FELA the entire field of injuries and claims a railroad employee may have." *Reidelbach*, ¶ 26 (citing *Pikop v. Burlington Northern Ry. Co.*, 390 N.W. 2d 743 (Minn. 1986), *cert. denied*, 480 U.S. 951, 941 L. Ed. 2d 800, 107 S. Ct. 1616 (1987)).

¶23 We reaffirm our conclusion in *Reidelbach* that the FELA does not occupy the entirety of the field of recovery for injured railroad employees so as to preempt State bad faith law claims premised on a self-insured railroad's claims-handling conduct. As we have previously determined, an insurer's claims handling and settlement practices constitute intentional conduct that is separate and distinct from the negligent cause of the

12

occupational injuries at issue in the underlying FELA claim. *See Reidelbach*, ¶ 44 ("The railroad's settlement practices do not arise from the railroad's negligence in the workplace, and will not influence the amount of FELA recovery . . . ."). *See also Graf v. Cont'l W. Ins. Co.*, 2004 MT 105, ¶ 12, 321 Mont. 65, 89 P.3d 22 ("The issues in a UTPA claim are separate from the issues in the underlying claim."). The focus of a UTPA action is not the amount of the settlement paid to the plaintiffs by the insurer. *Peterson v. Doctors' Co.*, 2007 MT 264, ¶¶ 39, 43, 339 Mont. 354, 170 P.3d 459. Instead, we focus on "the process used by [the insurer] before entering settlement." *Peterson*, ¶ 39. As we stated in *Peterson*,

> The essence of a claim under § 33-18-201, MCA, is that an insurer, given information available to it, has acted unreasonably in adjusting a claim, perhaps by failing to investigate, failing to communicate or failing to negotiate in good faith. Section 33-18-201, MCA, seeks to protect parties from such acts, and the relevant issue is almost universally *how the insurer acted* given the information available to it.

*Peterson*, ¶¶ 39, 43.

¶24 The hallmark of the FELA is that it "does not make the employer the insurer of the safety of his employees while they are on duty. The basis of his liability is his negligence, not the fact that injuries occur." *Anderson*, ¶ 67 (quoting *Conrail v. Gottshall*, 512 U.S. 532, 543, 114 S. Ct. 2396, 2404, 129 L. Ed. 2d 427, 440 (1994)). The FELA extends only to a railroad's negligent conduct resulting in occupational injuries. Nothing in the FELA's century-plus history evinces an intent that it would apply to a railroad's intentional bad faith conduct in handling the claim stemming from the injury. As we observed in *Reidelbach*, "[G]iven the humanitarian purpose of the FELA, we find it

13

inconceivable, as have several courts before us, that Congress intended the FELA to cover only certain railroad worker injuries while absolutely precluding any remedy for others." *Reidelbach*, ¶ 53 (citing *Mack v. Metro-North Commuter R.R.*, 878 F. Supp. 673, 677 (S.D.N.Y. 1995); *Rogers v. Consolidated RailCorp.*, 688 F. Supp. 835, 839 (N.D.N.Y. 1988); *Wabash R.R. v. Hayes*, 234 U.S. 86, 34 S. Ct. 729, 58 L. Ed. 1226 (1914)).

¶25 We most recently distinguished a railroad's claims-handling conduct from the negligent conduct at issue in a FELA action in *Sinclair*. There, an injured railroad employee brought an independent State law fraud claim challenging the validity of the release and settlement he entered with BNSF in the underlying FELA suit. *Sinclair*, ¶ 5. The release provided that the employee would "release and forever discharge" BNSF "from all claims and liabilities of every kind of nature, including claims for injuries, illnesses or damages, if any, which are unknown to me at the present time . . . ." *Sinclair*, ¶ 3. The District Court dismissed the employee's claims upon concluding that the FELA governed and did not permit him to "simultaneously affirm the validity of his release and independently pursue state law claims related to fraud." *Sinclair*, ¶ 28. We affirmed, holding that the employee's FELA release was "inextricably linked" to his claims and, unlike the bad faith claims at issue in *Reidelbach*, the FELA provided a direct remedy to challenge the validity of a fraudulent release. *Sinclair*, ¶¶ 33, 35 (citing *Reidelbach*, ¶¶ 43-44; *Counts v. Burlington N. R. Co.*, 896 F.2d 424, 425-26 (9th Cir. 1990)). *See also Dice v. Akron, C. & Y. R. Co.*, 342 U.S. 359, 361, 72 S. Ct. 312, 314, 96 L. Ed. 2d 398,

14

403 (1952) ("[V]alidity of releases under [the FELA] raises a federal question to be determined by federal rather than state law.").

¶26 Conversely, Dannels' FELA action provided him with no opportunity to recover damages for BNSF's alleged intentional bad faith conduct in handling his FELA claim. The only other available avenue of recovery for this type of conduct was through a separate State law bad faith action. BNSF's argument that the FELA preempts state bad faith claims would make the "inconceivable" void we cautioned against in *Reidelbach* a reality, in which a railroader has no remedy for a railroad's intentional claims-handling conduct, no matter how egregious. *See Reidelbach*, ¶ 53.

¶27 The infirmity of BNSF's preemption argument is laid bare by its motion in limine in the FELA action, in which it sought to preclude Dannels from referencing any "emotional distress not *directly tied to [his] physical injury*." (Emphasis added.) The very basis of BNSF's motion was that the FELA was limited in scope to physical injuries. This was granted by the District Court and the jury was instructed that it was limited to awarding damages for "injuries . . . sustained as a consequence of *physical impact*." (Emphasis added.) Having foreclosed any scrutiny of its claims handling in the FELA case, BNSF now incongruously argues that its claims handling should escape scrutiny in a bad faith action because it is preempted by the FELA.

¶28 Without being able to present evidence of BNSF's claims handling conduct to the jury, Dannels was likewise foreclosed from seeking damages for BNSF's alleged intentional bad faith conduct. Montana's bad faith laws fill the space left by the FELA and

15

advance our "overriding interest" in protecting Montana citizens from an insurer's bad faith claims practices and, as we discuss more fully below, "there is virtually no risk that the state cause of action would interfere with the effective administration" of the FELA. *Reidelbach*, ¶¶ 45-51 (citing *Farmer v. Carpenters*, 430 U.S. 290, 97 S. Ct. 1056, 51 L. Ed. 2d 338 (1977) (We must consult in a FELA preemption analysis the additional considerations of whether (1) "the underlying act or conduct is protected or permitted by the FELA; (2) the State has "an overriding interest in protecting its citizens from fraudulent, malicious and bad faith claims practices and the infliction of intentional emotional injury"; and (3) there is a "risk that the state cause of action would interfere with effective administration of FELA."). The FELA does not foreclose Dannels' claims by field preemption.

¶29 Finally, we examine conflict preemption. "Conflict preemption occurs when a state law conflicts with a federal law . . . ." *Mont. Immigrant Justice Alliance*, ¶ 29 (citing *Arizona*, 132 S. Ct. at 2501). "Such a conflict arises when 'compliance with both federal and state regulations is a physical impossibility . . . or when state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress . . . .'" *Hillsborough Cty.*, 471 U.S. at 713, 105 S. Ct. at 2375, 85 L. Ed. 2d at 721 (citations omitted).

¶30 BNSF argues conflict preemption is present between the UTPA and the FELA because the UTPA imposes an obligation on a self-insured employer to pay a plaintiff's lost wages and medical expenses in advance of a final settlement or judgment of the

16

underlying FELA claim when liability becomes reasonably clear. *See Ridley v. Guaranty Nat'l Ins. Co.*, 286 Mont. 325, 951 P.2d 987 (1997); *Dubray v. Farmers Ins. Exch.*, 2001 MT 251, 307 Mont. 134, 36 P.3d 897. In *Ridley*, we held that § 33-18-201(6) and (13), MCA, of UTPA "by their terms[] impose" an advance payment obligation on the insurer for an injured party's medical expenses not reasonably in dispute. *Ridley*, 286 Mont. at 334, 951 P.2d at 992. *See also Dubray*, ¶ 14 ("The essence of our holding in *Ridley* is that where liability is reasonably clear, injured victims are entitled to payment of those damages which are not reasonably in dispute without first executing a settlement agreement and final release."). We reasoned that prompt payment of an injured party's medical expenses was necessary:

> Medical expenses from even minor injuries can be devastating to a family of average income. The inability to pay them can damage credit and . . . sometimes preclude adequate treatment and recovery from the very injuries caused. Just as importantly, the financial stress of being unable to pay medical expenses can lead to the ill-advised settlement of other legitimate claims in order to secure a benefit to which an innocent victim of an . . . accident is clearly entitled.

*Ridley*, 286 Mont. at 335, 951 P.2d at 993. We explained the limits of our holding, however, stating:

> This does not mean that an insurer is responsible for all medical expenses submitted by an injured plaintiff. Liability must be reasonably clear for the expense to be submitted. That is, even though liability for the accident may be reasonably clear, an insurer may still dispute a medical expense if it is not reasonably clear that the expense is causally related to the accident in question.

*Ridley*, 286 Mont. at 334, 951 P.2d at 992. We later expanded our holding in *Ridley* when we decided *Dubray*, determining advance payments should include "[l]ost wages which

17

are reasonably certain and directly related to an insured's negligence or wrongful act . . . ." *Dubray*, ¶ 15.

¶31 BNSF, pointing to 45 U.S.C. §§ 51 and 53, asserts that the UTPA's advance payment obligation interferes with an employer's right under FELA to only be held liable for those damages determined by a jury at trial. "The right to trial by jury is 'a basic and fundamental feature of our system of federal jurisprudence" and . . . is 'part and parcel of the remedy afforded railroad workers under the [FELA].'" *Dice*, 342 U.S. at 363, 72 S. Ct. at 315, 96 L. Ed. 2d at 404 (quoting *Bailey v. Central V. Ry.*, 319 U.S. 350, 354, 63 S. Ct. 1062, 1064, 87 L. Ed. 1444, 1448 (1943)). BNSF's argument is misplaced.

¶32 First, it bears noting at the outset that Dannels made no demand for advance payment of either his wage loss or medical bills *until after* the jury had rendered a verdict in his FELA claim; nor did Dannels seek a declaratory judgment establishing BNSF's obligations to advance pay his wage loss or medical bills. Therefore, whether, and to what extent, these rights and obligations under the UTPA may conceivably conflict with a railroad's payment obligations under the FELA is not an issue that is squarely before us and we decline to speculate on Dannels' right to take hypothetical actions. *Independence Med. Supply, Inc. v. Mont. Dep't of Pub. HHS*, 2018 MT 57, ¶ 37, 391 Mont. 1, 414 P.3d 781 ("This Court has consistently held that we will not render advisory opinions.").

¶33 However, BNSF does not just argue that the FELA preempted Dannels' ability to file a declaratory judgment action, which he did not file, or seek advance payment of

18

medical expenses and wage loss, which he did not seek. BNSF also argues that the FELA preempts a railroad workers' right to seek redress for *all* bad faith conduct in the adjustment of a claim. We disagree.

¶34    Assuming, for the sake of argument, that the UTPA's advance pay obligations may conflict with any provisions of the FELA, this still would not provide a basis for the total preemption for which BNSF advocates. At most, it may provide a basis to foreclose a declaratory judgment action regarding advance pay obligations or for limiting the grounds upon which a worker may later seek bad faith damages under either the UTPA or the common law. But as we discussed above, there is a wide array of conduct that is proscribed by Montana's bad faith laws wholly exclusive of the advance pay obligations. BNSF's argument would effectively immunize it from all bad faith conduct. Like all states, Montana has an overriding interest in protecting its citizens from fraudulent, malicious, and bad faith claims practices and the infliction of intentional emotional injury, regardless of the source of that conduct. Sections 33-18-101, MCA, *et seq*. In light of the well-established remedial and humanitarian purpose of the FELA, it would be ironic, to say the least, if the FELA were to be used as a shield to immunize railroads from any accountability for all bad faith claims handling.

¶35    BNSF's obligations to adjust a claim in good faith do not impinge upon its right to a jury trial under the FELA any more than any other party's obligation to act in good faith when adjusting a personal injury claim that is not brought under the FELA. They are two separate actions, providing two distinct remedies for two distinct courses of conduct, for

damages that are wholly independent of each other. Indeed, this case illustrates this very point. In the FELA action, BNSF successfully sought to exclude reference to any damages Dannels may have sustained that were not directly related to his "physical injury." After the jury found in Dannels' favor, BNSF ultimately paid the judgment for Dannels' physical injury. The appeal presently before us is from a final judgment, to which BNSF stipulated, compensating Dannels for damages he sustained as a result of BNSF's claims handling, subsequent and in addition to the physical injuries that formed the basis of his FELA claim.

## CONCLUSION

¶36 Because Dannels made no demand for advance payment of either his wage loss or medical bills until after the jury had rendered a verdict in his FELA claim, and he did not seek a declaratory judgment on these issues, we decline to address whether these discrete claims may be preempted by the FELA. Regarding BNSF's argument that the FELA preempts a railroad workers' right to seek redress for *all* bad faith conduct in the adjustment of a claim, we affirm the District Court's holding that it does not.

/S/ JAMES JEREMIAH SHEA

We Concur:

/S/ MIKE McGRATH
/S/ INGRID GUSTAFSON
/S/ AMY EDDY
District Court Judge Amy Eddy
sitting for Justice Laurie McKinnon

20

Justice Dirk Sandefur, specially concurring.

¶37 I concur in the Court's opinion to the extent that it holds that FELA does not preempt a related but independent Montana law duty requiring railroads to handle FELA claims in a fair and reasonable manner under the particular facts and circumstances of each case in accordance with governing FELA standards of liability. However, contrary to the underlying presumption of the parties upon which the Court's analysis is predicated, I would hold that the UTPA bad faith claim provided in § 33-18-242, MCA, does not apply to BNSF because it is neither an "insurer," nor an entity "utilizing self-insurance" as referenced in § 33-18-242(8), MCA. I would further hold, however, that BNSF is nonetheless subject to a Montana common law claim for tortious FELA claims handling based on violation of the implied contract covenant of good faith and fair dealing and the special relationship between BNSF and injured workers in the FELA context.

**A.     BNSF Is Not an "Insurer" or Entity "Utilizing Self-Insurance" as Narrowly Recognized Under Montana Law**.

¶38 The UTPA is an integral component of the Montana Insurance Code. *See* §§ 33-1-101 and 33-18-101, MCA. At all times pertinent, the purpose of the Insurance Code has been to regulate the "transact[ion]" of the "business of insurance," as narrowly-defined by the Code. *See* §§ 33-1-101, -102, -201, 33-2-101, and -106, MCA. The narrower purpose of the UTPA has been to "regulate trade practices in the business of insurance" by "defining . . . and . . . prohibiting" unfair and deceptive "trade practices." Section 33-18-101, MCA.

21

¶39    Prior to 1987, the UTPA expressly proscribed various unfair insurance claims handling practices, but provided no express private cause of action for damages in tort when violated by insurers. *See* § 33-18-201, MCA (1977 Mont. Laws ch. 320, § 1). Independent of the UTPA, and based on the common law covenant of good faith and fair dealing implied as a matter of law in all contracts, insurers had a common law tort duty to their insureds, as parties to the insurance contract and in special relation to the insured thereunder, to settle first-party insurance claims within policy limits when liability under the policy was reasonably clear. *See Gibson v. W. Fire Ins. Co.*, 210 Mont. 267, 274-75, 682 P.2d 725, 730 (1984); *Lipinski v. Title Ins. Co.*, 202 Mont. 1, 15-16, 655 P.2d 970, 977 (1982) (citing *First Sec. Bank v. Goddard*, 181 Mont. 407, 419-20, 593 P.2d 1040, 1047 (1979)). *Accord Stephens v. Safeco Ins. Co. of Am.*, 258 Mont. 142, 145, 852 P.2d 565, 567-68 (1993) (citing *Lipinski* and *Goddard*). First-party claimants thus had a common law tort remedy against insurers for breach of that duty (*i.e.*, an insurance bad faith claim). *See Gibson*, 210 Mont. at 274-75, 682 P.2d at 730; *Lipinski*, 202 Mont. at 15-16, 655 P.2d at 977 (citing *Goddard*, 181 Mont. at 419-20, 593 P.2d at 1047). *Accord Stephens*, 258 Mont. at 145, 852 P.2d at 567-68 (citing *Lipinski* and *Goddard*). In contrast, as third parties to the insurance contract, third-party claimants had no similar common law remedy against insurers for failure to reasonably settle third-party liability claims against their insureds.

¶40    In 1983, in the absence of an express private remedy for violation of UTPA-proscribed unfair insurance claims handling practices, we recognized an implied third-party UTPA-based tortious bad faith claim against insurers. *Klaudt v. Flink*, 202

22

Mont. 247, 252, 658 P.2d 1065, 1067 (1983) (recognizing implied private right of action for damages based on violations of § 33-18-201(6), MCA), *overruled in part on other grounds by Fode v. Farmers Ins. Exch.*, 221 Mont. 282, 286-87, 719 P.2d 414, 416-17 (1986).[1] However, in 1987, motivated by the perceived need to ameliorate the effect of the *Klaudt* claim on business insurance rates, the Legislature considered a purported tort-reform bill primarily intended to "swing[] the pendulum back" by superseding it with a more limited independent statutory insurance bad faith claim, narrowly predicated on alleged violations of a specified subset of the unlawful trade practices proscribed in § 33-18-201, MCA. *See Bill to Revise Law Relating to Insurance Bad Faith Claims*, H.R. 240, 50th Leg., Reg. Sess. (1987); *House Judiciary Committee Hearing Minutes on House Bill 240*, 50th Leg., Reg. Sess. (Jan. 27, 1987); *Executive Session of House Judiciary Committee Hearing Minutes on House Bill 240*, 50th Leg., Reg. Sess. (Feb. 19, 1987); *Senate Business and Industry Committee Hearing Minutes on House Bill 240*, 50th Leg., Reg. Sess. (Mar. 9-11, 1987); and *Executive Session of Senate Business and Industry*

---

[1] Though we later anomalously referred to the *Klaudt* claim as a "common law" claim, it was more accurately an implied statutory private right of action implied from the then-remediless unlawful insurance trade practices proscribed by § 33-18-201, MCA. *See O'Fallon v. Farmers Ins. Exch.*, 260 Mont. 233, 243-44, 859 P.2d 1008, 1014-15 (1993) (characterizing *Klaudt* claim as "common law cause of action" predicated on violations of § 33-18-201, MCA); *compare Klaudt*, 202 Mont. at 250-52, 658 P.2d at 1066-67 (stating issue as whether § 33-18-201, MCA, "confers a private cause of action" and holding that § 33-18-201, MCA, created duties to third-party claimants, a breach of which is "the basis for a civil action"); *Fode*, 221 Mont. at 284-86, 719 P.2d at 415-16 (recognizing *Klaudt* claim as a UTPA-based claim rather than a common law claim). *See also Mark Ibsen, Inc. v. Caring for Montanans, Inc.*, 2016 MT 111, ¶¶ 41-42, 383 Mont. 346, 371 P.3d 446 (distinguishing statutorily-implied tort claims based on violations of statutory duty from common law claims based on violations of independent common law duties).

*Committee Hearing Minutes on House Bill 240*, 50th Leg., Reg. Sess. (Mar. 12, 1987). The bill became law and § 33-18-242, MCA, has remained unchanged since. *See* § 33-18-242, MCA (1987 Mont. Laws ch. 278, § 3).

¶41    The new independent statutory insurance bad faith claim was and remains expressly available to both first- and third-party claimants. Section 33-18-242(1), MCA. While the focus of the legislative impetus for the new action was on limiting the perceived adverse effect of the *Klaudt* claim, the new statute also expressly abolished and precluded independently recognized first-party common law bad faith claims. Section 33-18-242(3), MCA. Consistent with the language of § 33-18-201, MCA, and the common law standards from which it derived,[2] § 33-18-242, MCA, also expressly clarified that insurers had no statutory bad faith liability if a reasonable basis in fact or law existed for contesting liability or the amount of the claim. Section 33-18-242(5), MCA. The new statute further expressly provided that claimants did *not* have to prove, as otherwise required by the language of § 33-18-201, MCA, that an alleged UTPA claims handling "violation[] [was] of such frequency as to indicate a general business practice." Section § 33-18-242(2), MCA. *Compare* § 33-18-201, MCA. However, in an apparently uncontemplated quirk, the limited language of § 33-18-242, MCA, did not supplant the "common law" *Klaudt* claim

---

[2] *See White v. State ex rel. Montana State Fund*, 2013 MT 187, ¶¶ 17-30, 371 Mont. 1, 305 P.3d 795 (noting that UTPA-specified unfair trade practices derived from application of common law implied covenant of good faith and fair dealing in first-party insurance claim context).

it was intended to curb.  *See Brewington v. Emp'rs Fire Ins. Co.*, 1999 MT 312, ¶¶ 14-19, 297 Mont. 243, 992 P.2d 237.  *Compare* § 33-18-242(3), MCA.

¶42      Prior to enactment of § 33-18-242, MCA (1987), and by operation of the narrow Insurance Code definitions of "insurance" and "insurer," individuals and entities not primarily engaged in the business of providing contracts of insurance were not regulated "insurers," and thus not subject to § 33-18-201, MCA, and related tort liability under the UTPA-based *Klaudt* claim.  *See Ogden v. Montana Power Co.*, 229 Mont. 387, 391-93, 747 P.2d 201, 204-05 (1987) (holding that a public power utility was not an "insurer" for purposes of § 33-18-201, MCA, and *Klaudt* tort claim).  *Accord Martel v. Montana Power Co.*, 231 Mont. 96, 108, 752 P.2d 140, 147 (1988).  In *Ogden*, which like *Martel* involved a pre-1987 *Klaudt* claim alleging that the Montana Power Company unreasonably failed to settle a third-party negligence claim arising from a power line accident, we noted in passing that the Legislature had recently enacted § 33-18-242, MCA, which, *inter alia*, expressly applied the new statutory bad faith claim not only to insurers but also to "self-insurers." *Ogden*, 229 Mont. at 393, 747 P.2d at 205.  However, almost 35 years later, we have never had occasion to consider the meaning and intent of § 33-18-242(8), MCA (extending statutory insurance bad faith liability beyond insurers to those "*utilizing self-insurance* to pay claims made against them" (emphasis added)).

¶43      As a preliminary matter, § 33-18-242(8), MCA, was not present in the original bill introduced before the House Judiciary Committee in 1987.  *See Bill to Revise Law Relating to Insurance Bad Faith Claims*, H.R. 240, 50th Leg., Reg. Sess. (1987).   It was

mysteriously inserted without explanation or controversy in Executive Session before the bill passed out to the House floor. *See Executive Session of House Judiciary Committee Hearing Minutes on House Bill 240*, 50th Leg., Reg. Sess. (Feb. 19, 1987); *H.R. Journal*, 50th Leg., Reg. Sess., 762-63, 885, 909-10, 1379 (1987).[3] Nor was the subsection (8) self-insurance provision explained, discussed, or even referenced in any of the subsequent Senate proceedings on the bill. *See Senate Business and Industry Committee Hearing Minutes on House Bill 240*, 50th Leg., Reg. Sess. (Mar. 9-11, 1987); *Executive Session of Senate Business and Industry Committee Hearing Minutes on House Bill 240*, 50th Leg., Reg. Sess. (Mar. 12, 1987); *S. Journal*, 50th Leg., Reg. Sess., 815, 884, 904, 938 (1987). The legislative history of § 33-18-242, MCA, thus includes no indication of the perceived necessity or intended purpose for extending the new statutory insurance bad faith liability beyond "insurers" to those "utilizing self-insurance to pay claims made against them." In contrast to the precise Insurance Code definitions of "insurance" and "insurer," the bill and ultimate statute did not define the term "self-insurance" and, to this day, the term remains undefined in the UTPA and larger Insurance Code. Section 33-18-242(8), MCA, is thus facially vague or ambiguous as to whether the reference to those "utilizing self-insurance" broadly refers to all who simply have no insurance coverage for a particular type of liability

_____

[3] Subsection (8) was included in the bill with other amendments in regard to which the legislative intent and purpose was manifest without need for explanation or definition on the face of the amended bill. See § 33-18-242(5)-(7), MCA, regarding the "reasonable basis in law or in fact" defense, specified periods of limitations for the new statutory claim, and a procedural bifurcation requirement based on former § 33-18-241, MCA, and *Fode*, 221 Mont. at 287, 719 P.2d at 417. *See also Executive Session of House Judiciary Committee Hearing Minutes on House Bill 240*, 50th Leg., Reg. Sess. (Feb. 19, 1987).

26

claim and must thus necessarily "pay claims made against them" by other means or, alternatively, more narrowly refers only to those who have affirmatively elected and qualified to be a government-approved "self-insured" in accordance with a preexisting statutory scheme apart from the Insurance Code.

¶44 In that regard, nothing in the legislative history of § 33-18-242, MCA, manifests or suggests any legislative intent or purpose to broadly subject every individual or entity who technically has no third-party insurance coverage for particular types of claims to insurance bad faith liability under §§ 33-18-201 and -242(1), MCA, absent a reasonable basis in fact or law for disputing liability or the amount of a claim. To the contrary, the legislative history of § 33-18-242, MCA, indicates that the sole legislative impetus was to ameliorate the perceived adverse effect of the *Klaudt* claim by displacing it with an express statutory tort remedy more limited in scope and effect. Further indicating the complete absence of any legislative intent to significantly expand the scope of tort liability under the new statutory insurance bad faith claim are the historical facts that § 33-18-242, MCA, was a tort reform measure in which the subject "self-insurance" provision was inconspicuously included in a package of other more prominent amendments without explanation or controversy. As a matter of law, the Legislature is presumed to be fully aware of the substance and effect of its prior enactments. Under the totality of these circumstances, the only reasonably conceivable explanation for the complete absence of explanation, definition, reference, or controversy regarding the "self-insurance" provision in the

27

otherwise controversial bill was that the technical meaning of the term "self-insurance" was already established and well-known to the Legislature through other prior enactments.

¶45 In pertinent part, the Insurance Code has at all times pertinent narrowly defined the terms "insurance" and "insurer," to wit:

> "*Insurance*" is a *contract* through which one undertakes *to indemnify another or pay or provide* a specified or determinable amount or benefit *upon determinable contingencies*.

> "*Insurer*" includes every person *engaged as indemnitor, surety, or contractor in the business of entering into contracts of insurance*.

Section 33-1-201(5)(a) and (6), MCA (emphasis added).[4]  The Code has at all times further defined the derivative terms "authorized insurer," "domestic insurer," "foreign insurer," and "alien insurer," and specified for all that no "person acting as an insurer" may "transact[] insurance in this state" without a prior "certificate of authority issued by the [insurance] commissioner" in accordance with the requirements of §§ 33-2-106 and -115 through -117, MCA.  Sections 33-1-201(1)-(4), (9), and 33-2-101, MCA.  *See also* § 33-1-201(10), MCA (defining the term "unauthorized insurer").

¶46 Against that precisely-defined statutory backdrop, the concept of "self-insurance" was already established and well-known to the Legislature prior to 1987 in the Montana Workers' Compensation Act (Work-Comp Act) and the Montana Motor Vehicle Insurance

---

[4] It is of further note that, at all times pertinent, the limited purpose of the Insurance Code has been to regulate the "transact[ion] [of the] business of insurance" or "insurer transacti[on] [of] insurance," and that the limited purposes of the UTPA thereunder has been to "regulate [unfair or deceptive] trade practices in the business of insurance."  Sections 33-1-102(1), 33-2-101(1), and 33-18-101, and -102, MCA.

28

Responsibility and Verification Act (MVIRVA). Under the Work-Comp Act, Montana employers have at all times pertinent had three options by which to provide mandatory workers' compensation insurance benefits to employees. First, there were and remain two options for acquiring the requisite insurance coverage from third-party providers—under an insurance policy provided by a Montana-regulated "insurer" or by coverage acquired from the statutory "state fund." Section 39-71-2201, et seq., MCA (Plan 2 private insurance option);[5] Title 39, chapter 71, part 23, MCA (Plan 3 state fund option). As the third option, employers could and can elect, upon "permission" of the responsible state agency, to "provide *self-insured* workers' compensation benefits for their employees." Sections 39-71-2101 and -2103, MCA (Plan 1 self-insurance option). In order to obtain "permission" to provide self-insured workers' compensation benefits, the Work-Comp Act has at all times required applicants to "*furnish*[] *satisfactory proof . . .* of *solvency and financial ability to pay* the compensation and benefits provided [under the Act] . . . *and to discharge all liabilities . . .* reasonably likely to be incurred" during the subject time period. Section 39-71-2101(1), MCA (1915 Mont. Laws ch. 96, § 30) (emphasis added). *See also* § 39-71-116(17), MCA (defining "insurer" as referenced in the Work-Comp Act to *inter alia* include employers who elect to be "bound by compensation plan No. 1").

---

[5] As of 2007, employers can also obtain the requisite Plan 2 workers' compensation insurance coverage from a "captive reciprocal insurer established by or on behalf of any employer or a group of employers." Section 39-71-2201(3), MCA (2007 Mont. Laws ch. 117, § 10). However, "captive" insurance companies were not authorized to transact insurance in Montana until after 2001, and then only as regulated under the Insurance Code. *See* §§ 33-28-101, -102, et seq., MCA (2001 Mont. Laws ch. 298, § 1, as amended by 2003 Mont. Laws ch. 383, §§ 8-9).

¶47 Similarly, for purposes of the MVIRVA mandatory motor vehicle liability insurance requirement, "[a]ny person in whose name more than 25 motor vehicles are registered may qualify as a *self-insurer* by obtaining a *certificate of self-insurance* issued by the [Montana Department of Justice]." Section 61-6-143(1), MCA (1951 Mont. Laws ch. 204, § 34) (emphasis added). MVIRVA self-insurance certificates are available only on verification of the requisite fleet requirement and satisfactory proof that the applicant "is possessed and will continue to be possessed of ability to pay judgments obtained against such person." Section 61-6-143(2), MCA (1951 Mont. Laws ch. 204, § 34). For purposes of a certificate of self-insurance, "[p]roof of financial responsibility" means "proof of ability to respond in damages for liability on account of accidents occurring subsequent . . . [thereto and] arising out of the ownership, maintenance, or use of a motor vehicle." Section 61-6-102(9), MCA.

¶48 Thus, as manifest in the Work-Comp Act and MVIRVA, there has been at all times pertinent a significant and well-known technical legal distinction under Montana law between affirmatively government-approved "self-insurers" and others who, for whatever reason, technically have no insurance coverage for a type of liability claim and must pay through other means when necessary. We must construe statutory terms or phrases that have technical meaning in accordance with any "peculiar and appropriate meaning [acquired] in law." Section 1-2-106, MCA. Here, as referenced in § 33-18-242(8), MCA, and in the absence of a contrary statutory provision, the phrase individual or entity "utilizing self-insurance" has technical legal meaning referring only to those who

30

affirmatively obtain statutorily-specified government approval or verification to self-insure or utilize self-insurance for liabilities within the scope of a statutorily-mandated form or level of insurance, such as compulsory workers' compensation or automobile liability insurance, for example.

¶49     In the context of construing a standard insurance policy "other insurance" provision, the New Jersey Superior Court, Appellate Division, long ago aptly explained the significant distinction between the broad colloquial meaning of "self-insurance" and the more narrow technical legal meaning of the term under a state insurance regulatory scheme similar to ours, to wit:

> We start from the premise that so-called *self-insurance is not insurance at all*. *It is the antithesis of insurance*. The essence of an insurance contract is the shifting of the risk of loss from the insured to the insurer. The essence of *self-insurance,* a term of *colloquial currency rather than of precise legal meaning*, is the retention of the risk of loss by the one upon whom it is directly imposed by law or contract. . . . Clearly then, [in the broadest colloquial sense,] [any]one may be regarded as a self-insurer as to any risk of loss to which he is subject and which is susceptible to insurance coverage but as to which he has not obtained such coverage. . . . *But* as a matter both of common sense and the fundamentals of insurance law, *a failure to purchase obtainable insurance is not itself insurance*. That failure *simply and inevitably means that there is no insurance for that risk*. Thus, the undertaking to self-insure cannot, by definition, be regarded as insurance.

*Am. Nurses Ass'n v. Passaic Gen. Hosp.*, 471 A.2d 66, 69 (N.J. Super. Ct. App. Div. 1984) (internal citations omitted), *reversed in part on other grounds*, 484 A.2d 670 (N.J. 1984).[6]

---

[6] *See also Aerojet-General Corp. v. Transport Indem. Co.*, 948 P.2d 909, 930 n.20 (Cal. 1997) ("[i]n a strict sense, 'self-insurance' is a 'misnomer[]' . . . '[s]elf-insurance is equivalent to no insurance'" (internal citations omitted)); *Aetna Cas. & Sur. Co. v. World Wide Rent-A-Car, Inc.*, 284 N.Y.S.2d 807, 809 (N.Y. App. Div. 1967) (auto liability self-insurance is not insurance); *State*

However, in contrast to "the general, imprecise and amorphous concept of self-insurance,"

the New Jersey Court further recognized that:

> there is *one type of self-insurance . . .* [*with*] *a legally-recognized identity* and a *clearly defined consequence*. We refer to the situation in which [a] *compulsory liability insurance . . .* [scheme] provides that a person subject to the mandate may, *in accordance with specified standards and upon a satisfactory showing of financial ability to bear the risk, be exempted from the obligation to purchase insurance* upon issuance by a designated administrative officer or agency of a certificate of self-insurance. . . . This *qualified self-insurance*, as it may be termed for convenience in reference, has been held to require the self-insurer to provide the public sought to be protected by the compulsory insurance with the same "coverage" and incidents of "coverage" as he would have had to have purchased but for the certificate of self-insurance.

*Am. Nurses Ass'n*, 471 A.2d at 69 (emphasis added).[7]

---

*Farm Mut. Auto. Ins. Co. v. Du Page Cty*, 955 N.E.2d 67, 74-75 (Ill. App. Ct. 2011) (county that is colloquially self-insured "is not an insurer or an insurance company"—"[a]n insurance policy is a contract requiring two parties, an insurer and an insured"); *State v. Continental Cas. Co.*, 879 P.2d 1111, 1116 (Idaho 1994) (self-insurance is not insurance "[b]ecause [it] does not involve a transfer of the risk of loss"—merely "a retention of that risk"); *Cordova v. Wolfel*, 903 P.2d 1390, 1392 (N.M. 1995) ("[m]ost authorities agree that self-insurance is not insurance"—"[i]nsurance is a contract whereby for consideration one party agrees to indemnify or guarantee another party against specified risks"); *Am. Family Mut. Ins. Co. v. Missouri Power & Light Co.*, 517 S.W.2d 110 (Mo. 1974) (auto liability self-insurance is not insurance); *Eakin v. Indiana Intergovt'l Risk Mgmt Auth.*, 557 N.E.2d 1095, 1101 (Ind. Ct. App. 1990) (colloquial self-insurance through risk-pooling is not insurance because "the risks and costs of civil liability are completely internalized among [the] participants" without "shift[ing] the risk to for-profit risk takers"—quoting *Antiporek v. Vill. of Hillside*, 499 N.E.2d 1307 (Ill. 1986)).

[7] *See also Martin v. Powers*, 505 S.W.3d 512, 519-20 (Tenn. 2016) (noting "many formal procedures . . . whereby an entity can become recognized as a self-insurer" under state law, "most commonly . . . by filing a bond or furnishing another form of proof of the ability to pay amounts for which the self-insurer may become liable" (internal punctuation and citation omitted)); *United Nat. Ins. Co. v. Philadelphia Gas Works*, 289 A.2d 179, 181 (Pa. Super. Ct. 1972) (a certificate of self-insurance under a mandatory motor vehicle liability scheme "is not an insurance policy . . . [its] purpose . . . is the protection of the public against an owner of vehicles"—not to ensure indemnification of individual tortfeasors (citing *Farm Bureau Mut. Auto. Ins. Co. v. Violano*, 123 F.2d 692, 696 (2d Cir. 1941)).

¶50     Here, it is beyond genuine material dispute that, as an interstate common carrier, BNSF is not an "insurer" engaged in the transaction of the "business of insurance" as referenced and defined in §§ 33-1-102(1), -201(1)-(6), (9), and 33-18-101, MCA.  As a state law matter, BNSF is thus not subject to the Montana Insurance Code or UTPA, unless as an entity "utilizing self-insurance to pay claims made against [it]," as referenced in § 33-18-242(8), MCA.  In that regard, the Montana Work-Comp Act does not apply to BNSF as a matter of law, and the underlying FELA claim at issue does not arise as a matter of fact or law within the scope of the MVIRVA.  Nor does it arise under any similar compulsory insurance scheme under Montana law.

¶51     Dannels nonetheless implicitly asserts that BNSF "utilizes self-insurance" as referenced in § 33-18-242(8), MCA, because it "is reimbursed" for FELA claim payouts by a "captive" company, "BNSF Insurance," a Bermuda-incorporated entity through which BNSF "participates in reinsurance pooling agreements with other railroads."  (Emphasis added.)  However, taking his description of "BNSF Insurance" as true, Dannels as a matter of law cannot demonstrate that BNSF's alleged reinsurance pooling agreements with other railroads through an unregulated "captive" subsidiary either constitute "insurance" or "self-insurance" as narrowly recognized under Montana law and referenced in § 33-18-242(8), MCA.[8]     Dannels cannot distinguish BNSF's "reinsurance" pooling

_____

[8] Even under an alternative "insurer" or "captive insurer" theory of liability under § 33-18-242, MCA, Dannels has made no assertion, much less showing, that either BNSF or "BNSF Insurance" is a "foreign insurer," "alien insurer," or "authorized insurer," as defined and regulated under §§ 33-1-201(1)-(6), (9), 33-2-101, -106, and -115 through -117, MCA, and

33

agreements through an unregulated "captive" subsidiary as anything more than an example

of the "myriad" of "customary [non-insurance] private indemnity agreement[s]"

distinguished by the New Jersey Court from true insurance or statutorily qualified

self-insurance, to wit:

> The . . . question [arises as to] whether there should be any different result when the nature of the *self-insured risk* of loss is an *obligation to indemnify*. We do not perceive any viable conceptual basis for ascribing different consequences to that risk of loss. . . . It is clear that all contracts of insurance are, basically, indemnity agreements. But *all indemnity agreements are not insurance contracts*. . . . As a matter of common understanding, usage, and legal definition, an insurance contract denotes a policy issued by an authorized and licensed insurance company whose primary business it is to assume specific risks of loss of members of the public at large in consideration of the payment of a premium. There are, however, other risk-shifting agreements which are not insurance contracts. These include the customary *private indemnity agreement where affording the indemnity is not the primary business of the indemnitor and is not subject to governmental regulation but is merely ancillary to and in furtherance of some other independent transactional relationship between the indemnitor and the indemnitee*. The indemnity is, thus, not the essence of the agreement creating the transactional relationship but is only one of its negotiated terms. . . . There are myriad other examples.

---

engaged in the transaction of the business of insurance in Montana as referenced in §§ 33-1-102(1) or 33-18-101, MCA. Moreover, while "captive insurers," including reciprocal captive insurers, *inter alia*, may now transact insurance under Montana law, they may do so only subject to regulation under the Montana Insurance Code upon advance issuance of a "certificate of authority" issued upon qualification by the Montana insurance commissioner. *See* § 33-28-102(2), MCA. Dannels has neither stated, nor shown, any reason to believe that "BNSF Insurance" is a regulated "captive insurer" authorized to transact business in Montana. He has further failed in any event to allege or show that "BNSF Insurance" was in any manner directly involved in the actual handling of the FELA claim at issue or FELA claims in general.

*Am. Nurses Ass'n*, 471 A.2d at 70-71 (emphasis added).[9]  Thus, contrary to Dannels'

implied assertion, BNSF is in any event not a "self-insurer" or entity "utilizing

self-insurance" for FELA claims as recognized under Montana law and referenced in

§ 33-18-242(8), MCA.

¶52    At bottom as to FELA claims, whatever the structure of its unregulated subsidiary

"BNSF Insurance," BNSF is neither an "insurer," nor an entity that "utilizes

self-insurance" as narrowly recognized under Montana law.  On this record, it is no more

than a technically-uninsured private entity, primarily engaged in business as a common

carrier of freight, and which participates in non-insurance liability indemnification

agreements with other non-insurer railroads through a wholly owned subsidiary not

regulated for that purpose under Montana law.  As a matter of law, BNSF is neither an

"insurer," nor an entity utilizing "self-insurance," as referenced in § 33-18-242(1) and (8),

MCA, and is thus not subject to liability for unfair FELA claims handling practices under

§ 33-18-242, MCA.

**B.    BNSF Has a First-Party Common Law Duty of Good Faith and Fair Dealing Under Montana Law to Reasonably Investigate and Settle FELA Claims When FELA Liability Is Reasonably Clear**.

¶53    The employment relationship between railroads and railroad workers is first and

foremost a contractual relationship arising under and governed by Montana law, except to

the extent preempted by applicable federal law.  Sections 39-2-101 and -903(2), MCA;

---

[9] *See also Crone v. Crone*, 2003 MT 238, ¶ 30, 317 Mont. 256, 77 P.3d 167 (insurance is only one form of contract indemnity with another).

U.S. Const. art. VI. As a matter of fact, the contractual employment relationship between BNSF and its railway workers, including Dannels, is presumably governed by the terms of a collective bargaining agreement (CBA), as is typical, which are in turn governed by federal labor law, such as the Labor Management Relations Act (LMRA), 29 U.S.C. § 185(a), and/or the Railway Labor Act (RLA), 45 U.S.C. § 151, et seq., as applicable.[10] As a matter of law, the LMRA and RLA separately preempt state law claims for relief that depend on application or interpretation of the express terms of CBAs in interstate commerce. Conversely, however, the LMRA and RLA do not preempt employee claims against employers predicated on alleged breach of independent legal duties that do not depend on interpretation or application of the express terms of an otherwise governing CBA. *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 260-66, 114 S. Ct. 2239, 2247-51 (1994) (noting that RLA preemption standard is "virtually identical to" the LMRA preemption standard recognized in *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220, 105 S. Ct. 1904, 1916 (1985)); *Pike v. Burlington N. R.R. Co.*, 273 Mont. 390, 398-401, 903 P.2d 1352, 1357-59 (1995) (citing *Hawaiian Airlines*).[11]

---

[10] It is unclear and beyond the scope of the matters at issue to discern whether and to what extent Dannels is subject to a CBA governed by the RLA, LMRA, or both.

[11] *Accord Winslow v. Montana Rail Link, Inc.*, 2000 MT 292, ¶¶ 14-27, 302 Mont. 289, 16 P.3d 992 (state statutory wrongful discharge and non-injury-based negligent railroad management claims not preempted by LMRA or RLA where not based on an alleged breach, or interpretation or application of, an express term of the CBA); *Foster v. Albertsons, Inc.*, 254 Mont. 117, 123-28, 835 P.2d 720, 724-27 (1992) (state common law wrongful discharge claim based on tortious breach of implied covenant of good faith and fair dealing preempted by LMRA because proof dependent on interpretation or application of express terms of LMRA-governed CBA, but not independent state law claim for retaliatory discharge regarding sexual harassment claim not

¶54    As a matter of state law, implied by law in every contract is a covenant of good faith and fair dealing that requires "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." Section 28-1-211, MCA,[12] *Story v. City of Bozeman*, 242 Mont. 436, 449-50, 791 P.2d 767, 774-75 (1990). The covenant derives from the "justified expectation" of each party "that the other will act in a reasonable manner" within the framework of the express terms of the contract. *Story*, 242 Mont. at 450, 791 P.2d at 775. The extent of the implied covenant thus depends upon the justified expectations of the parties under the totality of the circumstances under the particular contractual setting at issue. *See Hardy v. Vision Serv. Plan*, 2005 MT 232, ¶¶ 13-17, 328 Mont. 385, 120 P.3d 402. By nature, proof of breach of the implied covenant of good faith and fair dealing does not require or depend on proof of breach of an express contract term. *Story*, 242 Mont. at 450, 791 P.2d at 775. Proof of an alleged breach of the implied covenant merely requires proof that the offending party acted within the framework of the express contract in a manner that was an unreasonable deviation from prevailing commercial standards of reasonableness in the trade at issue. *See Story*, 242 Mont. at 448-50, 791 P.2d at 774-75.

---

predicated or dependent on express terms of the CBA); *Smith v. Montana Power Co.*, 225 Mont. 166, 169-71, 731 P.2d 924, 926-27 (1987) (common law wrongful discharge claim based on alleged tortious breach of implied covenant of good faith and fair dealing preempted by LMRA where proof of the claim was "substantially dependent" on express terms of the LMRA-governed CBA).

[12] *See also* §§ 30-1-201(2)(u) and -203, MCA (UCC recognition of implied covenant of good faith).

*Accord Phelps v. Frampton*, 2007 MT 263, ¶ 29, 339 Mont. 330, 170 P.3d 474; *Hardy*, ¶ 13; *Weldon v. Montana Bank*, 268 Mont. 88, 94-95, 885 P.2d 511, 515 (1994).

¶55    In the context of FELA and the underlying relationship between a railroad and union railway workers, the CBA is the base employment contract which, in pertinent essence, expressly provides that covered railroad workers will perform assigned work as directed in return for specified wages and benefits in accordance with the CBA, subject to specified discipline and discharge provisions and rules. Upon formation of the employment contract, FELA independently imposes on railroads a federal statutory duty to compensate workers for work-related injuries in accordance with its remedial standard of liability.[13] As a matter of law, the net effect of the railroad employment contract, FELA, and covenant of good faith and fair dealing implied in the contract as a matter of law is the mutual expectation of the parties that the employing railroad will fairly and reasonably compensate its workers for work-related injury in accordance with FELA liability standards. Accordingly, by operation of the implied covenant of good faith and fair dealing overlaying the employment contract in the FELA context, employing railroads have an implied Montana common law contract duty to handle Montana-accrued FELA claims in a manner that is reasonable under

---

[13] Congress enacted FELA for the humanitarian purpose of ameliorating the harsh common law obstacles that previously impeded railroad workers from obtaining compensation for work-related injury. *See* 45 U.S.C. § 51; *Consolidated Rail Corp. v. Gottshall*, 512 U.S. 532, 542-43, 114 S. Ct. 2396, 2403-04 (1994) ("[c]ognizant of the physical dangers of railroading that resulted in the death or maiming of thousands of workers every year, Congress crafted a federal remedy that shifted part of the 'human overhead' of doing business from employees to their employers" (internal citations omitted)).

the facts and circumstances of each case in accordance with the governing FELA standard of liability.

¶56    As previously held in *Reidelbach v. Burlington N. & Santa Fe Ry. Co.*, 2002 MT 289, 312 Mont. 498, 60 P.3d 418, and again today, under the erroneous presumption procedurally foisted on the Court by the parties' stipulation below that the UTPA applies to railroads operating in Montana,[14] FELA does not preempt an independent state common law fair claims handling duty implied from the employment contract because FELA neither imposes, nor precludes, such a related but distinct legal duty.  Nor does such state law duty in any way impede or interfere with any purpose, provision, or operation of FELA for purposes of the federal field preemption doctrine.  Despite that it would not arise as a matter of law in the absence of the underlying employment contract, the FLMA and the RLA, as applicable, similarly do not preempt such a duty because it arises as a matter of state law independent of the express terms of any otherwise governing CBA and is not dependent on interpretation or application thereof.  *See Atchison, Topeka & Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 561-67, 107 S. Ct. 1413-16 (1987) (holding that recovery of emotional

---

[14] Unlike Dannels' asserted claim of UTPA liability here, *Reidelbach* did not involve an express UTPA insurance bad faith claim under § 33-18-242, MCA.  *See Reidelbach*, ¶¶ 10 and 51.  Rather, *Reidelbach* involved a UTPA-implied third-party *Klaudt* claim theory (citing *Brewington v. Emp'rs Fire Ins. Co.*, 1999 MT 312, 297 Mont. 243, 992 P.2d 237 and § 33-18-101, MCA) and, alternatively, an inconsistent first-party common law tortious bad faith claim based on alleged breach of the implied covenant of good faith and fair dealing (citing *Story v. City of Bozeman*, 242 Mont. 436, 791 P.2d 767 (1990)) with reference to an alleged qualifying special relationship between Reidelbach and BNSF.  *See Reidelbach*, ¶¶ 10 and 51.  As here, the focus in *Reidelbach was* on the narrow FELA preemption issue without analysis of whether the asserted state law claim even stated a cognizable claim for relief as applied to BNSF as a threshold matter of Montana law.

39

distress damages under FELA would not be inconsistent or in conflict with RLA collective bargaining scheme). Thus, neither FELA, nor the RLA/FLMA, preempt an implied Montana contract duty requiring railroads to handle FELA claims in a fair and reasonable manner in accordance with FELA liability standards.

¶57 However, as in the foregoing analysis of the inapplicability of § 33-18-242, MCA, to BNSF, a similar threshold state law question remains as to whether an independent common law tortious bad faith claims handling claim would lie against BNSF on its constituent elements. We have long recognized that Montana employers have an implied common law contract duty "to deal fairly and in good faith with [their] employees." *Morse v. Espeland*, 215 Mont. 148, 152, 696 P.2d 428, 430 (1985). *Accord Nicholson v. United Pac. Ins. Co.*, 219 Mont. 32, 40, 710 P.2d 1342, 1347 (1985) (internal citations omitted), *overruled in part on other grounds by Story*, 242 Mont. at 450, 791 P.2d at 775 (in re standard for tortious violation); *Weber v. Blue Cross of Montana*, 196 Mont. 454, 463-64, 643 P.2d 198, 203 (1982). While generally compensable only in contract by contract damages, *Hardy*, ¶ 13; *Story*, 242 Mont. at 450-51, 791 P.2d at 775-76, breach of the implied covenant is compensable in tort if the breach occurred in the context of a "special relationship" between the parties "not otherwise controlled by specific statutory provisions." *Story*, 242 Mont. at 451-52, 791 P.2d at 776. A special relationship giving rise to tort liability for breach of the implied covenant exists when:

> (1) "the contract [is] such that the parties are in inherently unequal bargaining positions";

(2)	the weaker party had a non-profit motivation for entering into the contract, such as "to secure peace of mind, security, [or] future protection";

(3)	"ordinary contract damages are not adequate" to remedy the breach because they "do not require the party in the superior position to account for its [wrongful] actions" and are not adequate to "make the inferior party 'whole'";

(4)	the weaker party "is especially vulnerable because of the type of harm [the party] may suffer" and the related necessity of placing trust in the stronger party to perform; and

(5)	the stronger party is aware of the special vulnerability of the weaker party.

*Story*, 242 Mont. at 451-52, 791 P.2d at 776 (quoting *Wallis v. Superior Court*, 207 Cal. Rptr. 123, 129 (Cal. Ct. App. 1984)).

¶58	Here, Dannels' railroad employment is presumably governed by the express terms of the federally regulated CBA under which BNSF employed him. His ultimate entitlement to compensation for work-related injury is then independently governed by FELA. Neither govern, however, the question of whether BNSF handled his FELA claim in a fair and reasonable manner under the circumstances in accordance with governing FELA liability standards. Nor is that question governed by any other specific statutory scheme. Thus, a common law tortious FELA claims handling claim is "not otherwise controlled by specific statutory provisions" for purposes of the threshold *Story* criterion here.

¶59	Turning to the *Story* special relationship criteria, substantial parity presumably exists between BNSF and union railroad workers in the collective bargaining process, at least in regard to the general terms and conditions of employment. However, Dannels'

41

entitlement to compensation for work-related injury under FELA is not dependent on the collective bargaining process or any resulting CBA. *See Buell*, 480 U.S. at 561-67, 107 S. Ct. at 1410-16. Moreover, like third-party claimants in the liability insurance context, injured railroad workers have no leverage, alternative, or remedy in the FELA claims handling and negotiation process other than the threat of FELA litigation, with nothing waiting in the end zone other than the compensation to which they would in any event be entitled under FELA liability standards from the get-go, albeit as significantly reduced by the cost of attorney fees necessary to acquire it. As a result, it is distinctly possible for the railroad to either delay or deny settlement of an injured worker's FELA claim, without a reasonable basis in fact or law for doing so, for no reason other than to leverage a more advantageous settlement against an economically desperate worker. Such scenarios are particularly damaging to injured workers who are temporarily or permanently unable to continue working in their former railroad capacity as a result of a work-related disability. Regardless of the relative parity between them as to other conditions of employment, employing railroads and injured workers are in inherently unequal, widely-disparate bargaining positions regarding the railroad's handling of their FELA personal injury claims.

¶60 Under the second and third *Story* criteria, railroad workers unquestionably have a motive for economic gain in accepting and continuing railroad employment for wages and related benefits. As a matter of law, however, they have no legitimate motive or interest in economic gain in obtaining fair and reasonably prompt compensation for work-related

personal injury due them under FELA. To that end, ordinary FELA damages compensate workers only for statutorily compensable injury and detriment caused by the subject work-related injury. FELA damages do not compensate injured workers for any additional provable harm caused by a railroad's failure to promptly settle a FELA claim in the absence of a reasonable basis in fact or law for contesting it. In that scenario, ordinary FELA damages are not only inadequate to make the injured claimant whole for the additional harm or detriment caused by unreasonable railroad intransigence in the claims handling process, but further provide no disincentive or deterrent sufficient to hold the offending railroad to account for additional harm or detriment caused thereby.

¶61 As to the fourth and fifth *Story* criteria, railroad workers who suffer more than minor injuries that do not result in wage loss are particularly vulnerable to unreasonable railroad claims handling because, in addition to the temporary or permanent disabling nature of the injury on a worker's physical integrity and function, the worker also inevitably faces the related economic hardships of immediate wage loss, concomitant costs of medical treatment and necessities of life, and the impairment of ability to work in any other railroad or non-railroad capacity for some indefinite time into the future, if not permanently. Employing railroads are unquestionably aware of this special vulnerability. Therefore, all of the *Story* criteria for recognition of a special relationship giving rise to an independent tort duty and liability between contracting parties are therefore present here as a matter of law. Consequently, unlike the UTPA insurance bad faith claim asserted by Dannels, an

43

independent Montana common law claim for tortious FELA claims handling is cognizable against BNSF.

¶62 Finally, by partial analogy to the UTPA standard of duty and liability, I would hold that the standard of duty for determining whether a railroad handled a FELA claim in a fair and reasonable manner is whether the railroad disputed the FELA claim without a reasonable basis in fact or law to dispute a material aspect of any of the essential elements of the claim under applicable FELA standards. *Cf.* §§ 33-18-201(6) and -242(5), MCA. In this context, whether a railroad had a reasonable basis in fact or law to dispute an essential element of a FELA claim is an objective standard based on consideration of governing FELA liability standards as applied to the railroad's knowledge of the pertinent facts and circumstances then available. *Cf. Peterson v. St. Paul Fire & Marine Ins. Co.*, 2010 MT 187, ¶ 39, 357 Mont. 293, 239 P.3d 904.[15] As in the UTPA context, an ultimate finding by the trier of fact on the elements of a FELA claim has no bearing on whether the railroad earlier reasonably disputed the claim based on the then-available material facts known and applicable law. *Cf. Peterson*, ¶ 39.

¶63 However, because they are predicated in our UTPA bad faith jurisprudence on more specific statutory duties specified in § 33-18-201, MCA, I would hold that insurance-specific concepts and constructs, such as advance-pay requirements and related

---

[15] I would further hold by partial analogy to the UTPA that the railroad's duty to handle an asserted FELA claim *inter alia* includes the duty to conduct a reasonable investigation of the claim based on all pertinent information then available. *Cf.* § 33-18-201(4), MCA.

preliminary declaratory judgment procedures, *inter alia*, have no analogous application in the railroad claims settlement context.[16] To further ensure accomplishment of FELA's intended federal purpose free of abuse or other undue interference with a railroad's administration of FELA claims, I would further hold that a tortious FELA claims handling claim is not cognizable or ripe for filing against a railroad until after all aspects of the underlying liability claim are fully resolved by written settlement agreement or final judgment in favor of the claimant, whether pursuant to M. R. Civ. P. 12, 56, or on verdict or finding of the trier of fact. *Cf.* § 33-18-242(6)(b), MCA.

¶64 In summary, I would hold that the UTPA bad faith claim provided in § 33-18-242, MCA, and incorporated unfair insurance trade practices specified in § 33-18-201, MCA, do not apply to BNSF because it is neither an "insurer," nor an entity "utilizing self-insurance," as referenced in § 33-18-242(1) and (8), MCA. I would further hold, however, that BNSF is nonetheless subject to state common law liability for tortious FELA claims handling based on breach of the implied contract covenant of good faith and fair dealing in the context of the special relationship between BNSF and injured workers in the remedial FELA context. On that basis, I specially concur in Court's opinion to the extent that it holds that FELA does not preempt a related but independent state law duty requiring

---

[16] I thus concur in Justice Rice's dissent to the extent that it points out the manifest incompatibility of such insurance-specific UTPA constructs and procedures with the FELA claims handling process.

railroads to handle FELA claims in a fair and reasonable manner under the particular facts and circumstances of each case in accordance with the governing FELA liability standards.

¶65    I recognize unabashedly that the parties did not raise the state law issues analyzed in this special concurrence on appeal.  However, I simply cannot and will not be a party to further perpetuation of the patently erroneous presumption, that BNSF is subject to UTPA tort liability for unfair insurance claims handling practices, foisted on the Court by the parties' stipulated narrow focus on whether FELA preempts that *only presumed* state law liability.  As a mischievous result of the limiting effect of that stipulation on the scope of the Court's analysis, the majority opinion will, if otherwise left standing on such a shaky state law predicate on subsequent FELA field preemption review in federal court, be hereafter cited as a canon holding that BNSF, an entity "utilizing self-insurance" in only the broadest colloquial sense under an undefined and unanalyzed statutory term, is subject to tort liability for violating UTPA-proscribed unfair *insurance* claims handling practices.  Surely to follow will be the further expansive use of this holding to similarly impose new tort liability unintended by the Legislature on other persons and entities who are simply uninsured in the technical sense.  I specially concur.

/S/ DIRK M. SANDEFUR


Justice Jim Rice, dissenting.

¶66    I would conclude that Dannels' Unfair Trade Practices Act (UTPA), §§ 33-18, MCA and Montana common law claims are preempted because the UTPA creates unique

46

obligations and damages conflicting with the comprehensive and exclusive framework for railroad carrier liability under the Federal Employers Liability Act (FELA), 45 U.S.C. §§ 51-60 (2021).

¶67 FELA is long recognized as the comprehensive and exclusive framework governing railroad employer's negligence. *South Buffalo Ry. Co. v. Ahern*, 344 U.S. 367, 371, 73 S. Ct. 340, 342 (1953). *See also* 45 U.S.C. § 54a; 49 U.S.C. § 20106(a)(1). In enacting FELA, Congress undertook *"to cover the subject* of the liability of railroad companies to their employees injured while engaged in interstate commerce." *New York Cent. R. Co. v. Winfield*, 244 U.S. 147, 152, 37 S. Ct. 546, 548 (1917) (emphasis added). FELA is a "broad remedial statute" and "defined in broad language, which has been construed even more broadly." *Atchison, Topeka & Santa Fe R.R. Co. v. Buell*, 480 U.S. 557, 561-62, 107 S. Ct. 1410, 1413 (1987) (footnotes omitted). FELA "establishes a rule or regulation which is *intended to operate uniformly* in all the States, as respects interstate commerce, and in that field it is both paramount and exclusive." *New York Cent. & Hudson River R. Co. v. Tonsellito*, 244 U.S. 360, 361-62, 37 S. Ct. 620, 621 (1917) (emphasis added). *See also Dice v. Akron, Canton & Youngstown R. R. Co.*, 342 U.S. 359, 361, 72 S. Ct. 312, 314 (1952) (stating that "only if federal law controls can the federal Act be given that uniform application throughout the country essential to effectuate its purposes") (citation omitted).[1]

---

[1] Regarding uniformity, as Appellant BSNF's brief indicates, "[i]n every State except Montana, a FELA employer is entitled to contest liability and damages on the merits unencumbered by additional substantive state-law duties."

47

¶68 Consequently, "Congress having declared when, how far, and to whom carriers shall be liable on account of accidents in the specified class, such liability can neither be extended nor abridged by common or statutory laws of the State." *Tonsellito*, 244 U.S. at 362, 37 S. Ct. at 621. "We do not doubt that [FELA] . . . displaces any state law trenching on the province of the Act." *Ahern*, 344 U.S. at 371, 73 S. Ct. at 342 (1953). State laws are preempted when they stand as an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in implementing a uniform system of regulation. *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S. Ct. 399, 404 (1941) (footnote omitted). In *Toscano v. Burlington N. R. R. Co.*, a Montana federal district court found that a claim based on Montana's common-law duty of good faith and fair dealing was preempted by FELA. *Toscano v. Burlington N. R. R. Co.*, 678 F. Supp. 1477 (D. Mont. 1987). *See also Monessen Sw. Ry. Co. v. Morgan*, 486 U.S. 330, 335, 108 S. Ct. 1837, 1842 (1988) (providing that even though FELA does not address interest payments, it was error to assess prejudgment interest under state law); *Sinclair v. Burlington N. & Santa Fe Ry. Co.*, 2008 MT 424, ¶ 35, 347 Mont. 395, 200 P.3d. 46 (affirming dismissal of state law fraud claim as preempted by FELA).

¶69 In conjunction with Montana's common law, the UTPA, particularly, as interpreted and applied in *Ridley v. Guaranty Nat'l Ins. Co.*, 286 Mont. 325, 951 P.2d 987 (1997), and its expanding progeny, provide both substantive and procedural state law remedies that virtually parallel, but also interfere with, FELA. The UTPA requires self-insured railroad carriers "to attempt in good faith to effectuate prompt, fair, and equitable settlements of

48

claims *in which liability has become reasonably clear.*" Section 33-18-201(6), MCA (emphasis added). Likewise, prior to claim settlement, and during the pendency of FELA claim litigation, the UTPA requires self-insured carriers to advance payments for an injured worker's medical expenses "for which liability has become reasonably clear," *Ridley*, 286 Mont. at 338, 951 P.2d at 994, and for other damages that "are not reasonably in dispute," such as "[l]ost wages which are reasonably certain," *DuBray v. Farmers Ins. Exchange*, 2001 MT 251, ¶¶ 14-15, 307 Mont. 134, 36 P.3d 897. Dannels' UTPA claims here are premised upon BNSF's alleged failure to settle his FELA claim promptly despite liability being reasonably clear and by declining to pay his lost wages prior to completion of the FELA litigation.

¶70    We have held that "reasonably clear" liability is not the same as "negligence." Liability is "reasonably clear when a reasonable person, with knowledge of the relevant facts and law, would conclude, for good reason, that the defendant is liable to the plaintiff." *Peterson v. St. Paul Fire & Marine Ins. Co.*, 2010 MT 187, ¶ 39, 357 Mont. 293, 239 P.3d 904 (quotations omitted). This standard is expressly different than negligence:

> A finding of liability by a trier of fact under the preponderance of evidence standard in the negligence action does not necessarily imply that liability was reasonably clear when the [defendant] was adjusting the claim. Instead, reasonably clear liability is established when it is clear enough that reasonable people assessing the claim would agree on the issue of liability.

*Peterson*, ¶ 39 (quotations omitted).

¶71    Additionally, procedural remedies have been expanded under the UTPA. While the UTPA prohibits injured claimants from "fil[ing] an action under this section until after the

underlying claim has been settled or a judgment entered in favor of the claimant on the underlying claim," § 33-18-242(6)(b), MCA, declaratory actions to obtain advance payments by showing reasonable clear liability are nonetheless authorized, even during the pendency of the underlying action, requiring a carrier to litigate in two forums. *See High Country Paving, Inc. v. United Fire & Cas. Co.*, 2019 MT 297, ¶ 22, 398 Mont. 191, 454 P.3d 1210 (citing *Dubray*, ¶ 16); *Teeter v. Mid-Century Ins. Co.*, 2017 MT 292, ¶ 18, 389 Mont. 407, 406 P.3d 464; *Safeco Ins. Co. v. Montana 8th Judicial Dist. Ct.*, 2000 MT 153, ¶ 20, 300 Mont. 123, 2 P.3d 834.

¶72 In contrast, FELA liability is a federal question resolved through principles of negligence and federal common law. *Consol. Rail Co. v. Gottshall*, 512 U.S. 532, 543, 114 S. Ct. 2396, 2404 (1993) (citing *Urie v. Thompson*, 337 U.S. 163, 182, 69 S. Ct. 1018, 1030-31 (1949); *Ellis v. Union Pacific R. R. Co.*, 329 U.S. 649, 653, 67 S. Ct. 598, 600 (1947) (establishing that the basis of liability is the carrier's negligence, "not the fact that injuries occur"). Specifically, FELA rests on the "principle that compensation should be exacted from the carrier where, *and only where*, the injury results from negligence imputable to it." *Winfield*, 244 U.S. at 150, 37 S. Ct. at 547-48 (emphasis added). "What constitutes negligence for the statute's purposes is a federal question, not varying in accordance with the differing conceptions of negligence applicable under state and local laws for other purposes." *Urie*, 337 U.S. at 174, 69 S. Ct. at 1027 (1949). "[N]o part [of FELA] points to any purpose to leave the States free to require compensation where the act withholds it." *Winfield*, 244 U.S. at 150, 37 S. Ct. at 548. Procedurally, any damages to

be paid by a carrier for its negligence under FELA must be determined by a jury in federal litigation. *Bailey v. Central Vt. Ry.*, 319 U.S. 350, 354, 63 S. Ct. 1062, 1064 (1943).

¶73 Montana's UTPA imposes various additional duties upon a self-insured carrier, including to advance damage payments and to attempt to settle, upon "reasonably clear" liability, regardless of whether a carrier is ultimately determined to be negligent by a jury in FELA litigation. Conceivably, a carrier could be required to advance damage payments to a claimant in a declaratory action when liability is "reasonably clear," while ultimately obtaining a jury verdict in the FELA action that it was not negligent, a result incompatible with federal precedent. *See Winfield*, 244 U.S. at 150, 37 S. Ct. at 547-48. The UTPA requires carriers to fight liability in Montana on dual fronts and under dual standards, with one decision necessarily impacting its liability or standing in the other. A carrier is forced to choose between incompatible options: reserve negligence defenses for trial in the FELA action and invite UTPA claims for failure to settle or advance damage payments; or, advance damage payments and settle the FELA action to avoid any UTPA claims without a jury determining negligence at trial, thus forfeiting any trial defenses.

¶74 The development of UTPA jurisprudence since *Reidelbach v. Burlington N. & Santa Fe Ry. Co.*, 2002 MT 289, 312 Mont. 498, 60 P.3d 418, the different claim posture, and the different question and arguments raised here, require a different outcome. While the loss of state law remedies is an unfortunate outcome, I believe the contradictory nature of these schemes requires the conclusion that the UTPA claims Dannels has made are preempted by FELA as an "obstacle to the accomplishment and execution of the full purposes and

51

objectives of Congress." *Hines*, 312 U.S. at 67, 61 S. Ct. at 404 (footnote omitted). Concluding Dannels' particular UTPA claims are preempted, I would reserve judgment regarding the preemption of other potential UTPA claims until properly raised in future litigation.

/S/ JIM RICE

Justice Beth Baker joins in the dissenting Opinion of Justice Rice.

/S/ BETH BAKER